HUTTO ET AL. *v.* FINNEY ET AL.

No. 76–1660.   Argued February 21, 1978—Decided June 23, 1978

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, and BLACKMUN, JJ., joined, in Part I of which WHITE, J., joined, and in Parts I and II–A of which BURGER, C. J., and POWELL, J., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 700. POWELL, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., joined, and in the dissenting portion of which WHITE and REHNQUIST, JJ., joined, *post*, p. 704. REHNQUIST, J., filed a dissenting opinion, in Part II of which WHITE, J., joined, *post*, p. 710.

*Garner L. Taylor, Jr.,* Assistant Attorney General of Arkansas, argued the cause for petitioners. On the brief were *Bill Clinton,* Attorney General, and *Robert Alston Newcomb.*

*Philip E. Kaplan* argued the cause for respondents. With him on the brief were *Jack Holt, Jr., Philip E. McMath, Jack*

Greenberg, *James M. Nabrit III, Charles Stephen Ralston, Stanley Bass, Eric Schnapper,* and *Lynn Walker.*[*]

MR. JUSTICE STEVENS delivered the opinion of the Court.[†]

After finding that conditions in the Arkansas penal system constituted cruel and unusual punishment, the District Court entered a series of detailed remedial orders. On appeal to the United States Court of Appeals for the Eighth Circuit, petitioners[1] challenged two aspects of that relief: (1) an order placing a maximum limit of 30 days on confinement in punitive isolation; and (2) an award of attorney's fees to be paid out of Department of Correction funds. The Court of

---

[*]Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *Gloria F. DeHart* and *Patrick G. Golden,* Deputy Attorneys General, for the State of California; by *Richard C. Turner,* Attorney General, *Stephen C. Robinson,* Special Assistant Attorney General, and *Theodore R. Boecker* and *Frederick M. Haskins,* Assistant Attorneys General, for the State of Iowa; and by *Robert P. Kane,* Attorney General, and *Melvin R. Shuster* and *J. Justin Blewitt, Jr.,* Deputy Attorneys General, for the Commonwealth of Pennsylvania.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Assistant Attorney General Days, Walter W. Barnett,* and *Dennis J. Dimsey* for the United States; by *Bruce J. Ennis, Burt Neuborne,* and *Richard Emery* for the American Civil Liberties Union et al.; and by *Charles A. Bane, Thomas D. Barr, Armand Derfner, Paul R. Dimond, Norman Redlich, Robert A. Murphy, Norman J. Chachkin, Richard S. Kohn, David M. Lipman,* and *William E. Caldwell* for the Lawyers' Committee for Civil Rights Under Law.

Briefs of *amici curiae* were filed by *A. F. Summer,* Attorney General, and *P. Roger Googe, Jr.,* and *Peter M. Stockett, Jr.,* Assistant Attorneys General, for the State of Mississippi; and by *John L. Hill,* Attorney General, *David M. Kendall,* First Assistant Attorney General, and *Joe B. Dibrell, Richel Rivers,* and *Nancy Simonson,* Assistant Attorneys General, for the State of Texas.

[†]MR. JUSTICE WHITE joins only Part I of this opinion.

[1] Petitioners are the Commissioner of Correction and members of the Arkansas Board of Correction.

Appeals affirmed and assessed an additional attorney's fee to cover services on appeal. 548 F. 2d 740 (1977). We granted certiorari, 434 U. S. 901, and now affirm.

This litigation began in 1969; it is a sequel to two earlier cases holding that conditions in the Arkansas prison system violated the Eighth and Fourteenth Amendments.[2] Only a brief summary of the facts is necessary to explain the basis for the remedial orders.

The routine conditions that the ordinary Arkansas convict had to endure were characterized by the District Court as "a dark and evil world completely alien to the free world." *Holt* v. *Sarver*, 309 F. Supp. 362, 381 (ED Ark. 1970) (*Holt II*). That characterization was amply supported by the evidence.[3]

---

[2] This case began as *Holt* v. *Sarver*, 300 F. Supp. 825 (ED Ark. 1969) (*Holt I*). The two earlier cases were *Talley* v. *Stephens*, 247 F. Supp. 683 (ED Ark. 1965), and *Jackson* v. *Bishop*, 268 F. Supp. 804 (ED Ark. 1967), vacated, 404 F. 2d 571 (CA8 1968). Judge Henley decided the first of these cases in 1965, when he was Chief Judge of the Eastern District of Arkansas. Although appointed to the Court of Appeals for the Eighth Circuit in 1975, he was specially designated to continue to hear this case as a District Judge.

[3] The administrators of Arkansas' prison system evidently tried to operate their prisons at a profit. See *Talley* v. *Stephens, supra,* at 688. Cummins Farm, the institution at the center of this litigation, required its 1,000 inmates to work in the fields 10 hours a day, six days a week, using mule-drawn tools and tending crops by hand. 247 F. Supp., at 688. The inmates were sometimes required to run to and from the fields, with a guard in an automobile or on horseback driving them on. *Holt* v. *Hutto,* 363 F. Supp. 194, 213 (ED Ark. 1973) (*Holt III*). They worked in all sorts of weather, so long as the temperature was above freezing, sometimes in unsuitably light clothing or without shoes. *Holt II,* 309 F. Supp., at 370.

The inmates slept together in large, 100-man barracks, and some convicts, known as "creepers," would slip from their beds to crawl along the floor, stalking their sleeping enemies. In one 18-month period, there were 17 stabbings, all but 1 occurring in the barracks. *Holt I, supra,* at 830–831. Homosexual rape was so common and uncontrolled that some potential victims dared not sleep; instead they would leave their beds and

The punishments for misconduct not serious enough to result in punitive isolation were cruel,[4] unusual,[5] and unpredictable.[6] It is the discipline known as "punitive isolation" that is most relevant for present purposes.

Confinement in punitive isolation was for an indeterminate period of time. An average of 4, and sometimes as many as 10 or 11, prisoners were crowded into windowless 8'x10' cells containing no furniture other than a source of water and a toilet that could only be flushed from outside the cell. *Holt* v. *Sarver,* 300 F. Supp. 825, 831–832 (ED Ark. 1969) (*Holt I*). At night the prisoners were given mattresses to spread on the floor. Although some prisoners suffered from infectious diseases such as hepatitis and venereal disease, mattresses were removed and jumbled together each morning,

---

spend the night clinging to the bars nearest the guards' station. *Holt II, supra,* at 377.

[4] Inmates were lashed with a wooden-handled leather strap five feet long and four inches wide. *Talley* v. *Stephens, supra,* at 687. Although it was not official policy to do so, some inmates were apparently whipped for minor offenses until their skin was bloody and bruised. *Jackson* v. *Bishop, supra,* at 810–811.

[5] The "Tucker telephone," a hand-cranked device, was used to administer electrical shocks to various sensitive parts of an inmate's body. *Jackson* v. *Bishop, supra,* at 812.

[6] Most of the guards were simply inmates who had been issued guns. *Holt II, supra,* at 373. Although it had 1,000 prisoners, Cummins employed only eight guards who were not themselves convicts. Only two nonconvict guards kept watch over the 1,000 men at night. 309 F. Supp., at 373. While the "trusties" maintained an appearance of order, they took a high toll from the other prisoners. Inmates could obtain access to medical treatment only if they bribed the trusty in charge of sick call. As the District Court found, it was "within the power of a trusty guard to murder another inmate with practical impunity," because trusties with weapons were authorized to use deadly force against escapees. *Id.,* at 374. "Accidental shootings" also occurred; and one trusty fired his shotgun into a crowded barracks because the inmates would not turn off their TV. *Ibid.* Another trusty beat an inmate so badly the victim required partial dentures. *Talley* v. *Stephens, supra,* at 689.

then returned to the cells at random in the evening. *Id.*, at 832. Prisoners in isolation received fewer than 1,000 calories a day;[7] their meals consisted primarily of 4-inch squares of "grue," a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking the mixture in a pan. *Ibid.*

After finding the conditions of confinement unconstitutional, the District Court did not immediately impose a detailed remedy of its own. Instead, it directed the Department of Correction to "make a substantial start" on improving conditions and to file reports on its progress. *Holt I, supra,* at 833–834. When the Department's progress proved unsatisfactory, a second hearing was held. The District Court found some improvements, but concluded that prison conditions remained unconstitutional. *Holt II,* 309 F. Supp., at 383. Again the court offered prison administrators an opportunity to devise a plan of their own for remedying the constitutional violations, but this time the court issued guidelines, identifying four areas of change that would cure the worst evils: improving conditions in the isolation cells, increasing inmate safety, eliminating the barracks sleeping arrangements, and putting an end to the trusty system. *Id.*, at 385. The Department was ordered to move as rapidly as funds became available. *Ibid.*

After this order was affirmed on appeal, *Holt* v. *Sarver,* 442 F. 2d 304 (CA8 1971), more hearings were held in 1972 and 1973 to review the Department's progress. Finding substantial improvements, the District Court concluded that continuing supervision was no longer necessary. The court held,

---

[7] A daily allowance of 2,700 calories is recommended for the average male between 23 and 50. National Academy of Sciences, Recommended Dietary Allowances, Appendix (8th rev. ed. 1974). Prisoners in punitive isolation are less active than the average person; but a mature man who spends 12 hours a day lying down and 12 hours a day simply sitting or standing consumes approximately 2,000 calories a day. *Id.*, at 27.

however, that its prior decrees would remain in effect and noted that sanctions, as well as an award of costs and attorney's fees, would be imposed if violations occurred. *Holt* v. *Hutto*, 363 F. Supp. 194, 217 (ED Ark. 1973) (*Holt III*).

The Court of Appeals reversed the District Court's decision to withdraw its supervisory jurisdiction, *Finney* v. *Arkansas Board of Correction*, 505 F. 2d 194 (CA8 1974), and the District Court held a fourth set of hearings. 410 F. Supp. 251 (ED Ark. 1976). It found that, in some respects, conditions had seriously deteriorated since 1973, when the court had withdrawn its supervisory jurisdiction. Cummins Farm, which the court had condemned as overcrowded in 1970 because it housed 1,000 inmates, now had a population of about 1,500. *Id.*, at 254–255. The situation in the punitive isolation cells was particularly disturbing. The court concluded that either it had misjudged conditions in these cells in 1973 or conditions had become much worse since then. *Id.*, at 275. There were twice as many prisoners as beds in some cells. And because inmates in punitive isolation are often violently antisocial, overcrowding led to persecution of the weaker prisoners. The "grue" diet was still in use, and practically all inmates were losing weight on it. The cells had been vandalized to a "very substantial" extent. *Id.*, at 276. Because of their inadequate numbers, guards assigned to the punitive isolation cells frequently resorted to physical violence, using nightsticks and Mace in their efforts to maintain order. Prisoners were sometimes left in isolation for months, their release depending on "their attitudes as appraised by prison personnel." *Id.*, at 275.

The court concluded that the constitutional violations identified earlier had not been cured. It entered an order that placed limits on the number of men that could be confined in one cell, required that each have a bunk, discontinued the "grue" diet, and set 30 days as the maximum isolation sentence. The District Court gave detailed consideration to

the matter of fees and expenses, made an express finding that petitioners had acted in bad faith, and awarded counsel "a fee of $20,000.00 to be paid out of Department of Correction funds." *Id.,* at 285. The Court of Appeals affirmed and assessed an additional $2,500 to cover fees and expenses on appeal. 548 F. 2d, at 743.

## I

The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, "proscribe[s] more than physically barbarous punishments." *Estelle* v. *Gamble,* 429 U. S. 97, 102. It prohibits penalties that are grossly disproportionate to the offense, *Weems* v. *United States,* 217 U. S. 349, 367, as well as those that transgress today's " 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.' " *Estelle* v. *Gamble, supra,* at 102, quoting *Jackson* v. *Bishop,* 404 F. 2d 571, 579 (CA8 1968). Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards. Petitioners do not challenge this proposition; nor do they disagree with the District Court's original conclusion that conditions in Arkansas' prisons, including its punitive isolation cells, constituted cruel and unusual punishment. Rather, petitioners single out that portion of the District Court's most recent order that forbids the Department to sentence inmates to more than 30 days in punitive isolation. Petitioners assume that the District Court held that indeterminate sentences to punitive isolation always constitute cruel and unusual punishment. This assumption misreads the District Court's holding.

Read in its entirety, the District Court's opinion makes it abundantly clear that the length of isolation sentences was not considered in a vacuum. In the court's words, punitive isolation "is not necessarily unconstitutional, but it may be, depending on the duration of the confinement and the con-

ditions thereof." 410 F. Supp., at 275.[8] It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual. If new conditions of confinement are not materially different from those affecting other prisoners, a transfer for the duration of a prisoner's sentence might be completely unobjectionable and well within the authority of the prison administrator. Cf. *Meachum* v. *Fano*, 427 U. S. 215. It is equally plain, however, that the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of

---

[8] The Department reads the following sentence in the District Court's 76-page opinion as an unqualified holding that any indeterminate sentence to solitary confinement is unconstitutional: "The court holds that the policy of sentencing inmates to indeterminate periods of confinement in punitive isolation is unreasonable and unconstitutional." 410 F. Supp., at 278. But in the context of its full opinion, we think it quite clear that the court was describing the specific conditions found in the Arkansas penal system. Indeed, in the same paragraph it noted that "segregated confinement under maximum security conditions is one thing; segregated confinement under the *punitive* conditions that have been described is quite another thing." *Ibid.* (emphasis in original).

The Department also suggests that the District Court made rehabilitation a constitutional requirement. The court did note its agreement with an expert witness who testified "that punitive isolation as it exists at Cummins today serves no rehabilitative purpose, and that it is counterproductive." *Id.*, at 277. The court went on to say that punitive isolation "makes bad men worse. It must be changed." *Ibid.* We agree with the Department's contention that the Constitution does not require that every aspect of prison discipline serve a rehabilitative purpose. *Novak* v. *Beto*, 453 F. 2d 661, 670–671 (CA5 1971); *Nadeau* v. *Helgemoe*, 561 F. 2d 411, 415–416 (CA1 1977). But the District Court did not impose a new legal test. Its remarks form the transition from a detailed description of conditions in the isolation cells to a traditional legal analysis of those conditions. The quoted passage simply summarized the facts and presaged the legal conclusion to come.

"grue" might be tolerable for a few days and intolerably cruel for weeks or months.

The question before the trial court was whether past constitutional violations had been remedied. The court was entitled to consider the severity of those violations in assessing the constitutionality of conditions in the isolation cells. The court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the "lack of professionalism and good judgment on the part of maximum security personnel." 410 F. Supp., at 277 and 278. The length of time each inmate spent in isolation was simply one consideration among many. We find no error in the court's conclusion that, taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.

In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation. The District Court had given the Department repeated opportunities to remedy the cruel and unusual conditions in the isolation cells. If petitioners had fully complied with the court's earlier orders, the present time limit might well have been unnecessary. But taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance.[9]

---

[9] As we explained in *Milliken* v. *Bradley,* 433 U. S. 267, 281, state and local authorities have primary responsibility for curing constitutional violations. "If, however '[those] authorities fail in their affirmative obligations . . . judicial authority may be invoked.' *Swann* [v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1,] 15. Once invoked, 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.'" *Ibid.* In this case, the District Court was not remedying the present effects of a violation in the past. It was seeking to bring an ongoing violation to an immediate halt. Cooperation on the part of Department officials and compliance with other aspects of the decree may justify elimi-

The order is supported by the interdependence of the conditions producing the violation. The vandalized cells and the atmosphere of violence were attributable, in part, to overcrowding and to deep-seated enmities growing out of months of constant daily friction.[10] The 30-day limit will help to correct these conditions.[11] Moreover, the limit presents little danger of interference with prison administration, for the Commissioner of Correction himself stated that prisoners should not ordinarily be held in punitive isolation for more than 14 days. *Id.*, at 278. Finally, the exercise of discretion in this case is entitled to special deference because of the trial judge's years of experience with the problem at hand and his recognition of the limits on a federal court's authority in a case of this kind.[12] Like the Court of Appeals, we find no error in the inclusion of a 30-day limitation on sentences to punitive isolation as a part of the District Court's comprehensive remedy.

---

nation of this added safeguard in the future, but it is entirely appropriate for the District Court to postpone any such determination until the Department's progress can be evaluated.

[10] The District Court noted "that as a class the inmates of the punitive cells hate those in charge of them, and that they may harbor particular hatreds against prison employees who have been in charge of the same inmates for a substantial period of time." 410 F. Supp., at 277.

[11] As early as 1969, the District Court had identified shorter sentences as a possible remedy for overcrowding in the isolation cells. *Holt I,* 300 F. Supp., at 834. The limit imposed in 1976 was a mechanical—and therefore an easily enforced—method of minimizing overcrowding, with its attendant vandalism and unsanitary conditions.

[12] See, *e. g., Holt II,* 309 F. Supp., at 369:

"The Court, however, is limited in its inquiry to the question of whether or not the constitutional rights of inmates are being invaded and with whether the Penitentiary itself is unconstitutional. The Court is not judicially concerned with questions which in the last analysis are addressed to legislative and administrative judgment. A practice that may be bad from the standpoint of penology may not necessarily be forbidden by the Constitution."

## II

The Attorney General of Arkansas, whose office has represented petitioners throughout this litigation, contends that any award of fees is prohibited by the Eleventh Amendment. He also argues that the Court of Appeals incorrectly held that fees were authorized by the Civil Rights Attorney's Fees Awards Act of 1976. We hold that the District Court's award is adequately supported by its finding of bad faith and that the Act supports the additional award by the Court of Appeals.

### A. The District Court Award

Although the Attorney General argues that the finding of bad faith does not overcome the State's Eleventh Amendment protection, he does not question the accuracy of the finding made by the District Court and approved by the Court of Appeals.[13] Nor does he question the settled rule that a losing litigant's bad faith may justify an allowance of fees to the prevailing party.[14] He merely argues that the order requir-

---

[13] In affirming the award, the Court of Appeals relied chiefly on the Civil Rights Attorney's Fees Awards Act of 1976, but it also noted expressly that "the record fully supports the finding of the district court that the conduct of the state officials justified the award under the bad faith exception enumerated in *Alyeska [Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240]." 548 F. 2d 740, 742 n. 6.

[14] An equity court has the unquestioned power to award attorney's fees against a party who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order. *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 258–259; *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412; *Straub* v. *Vaisman & Co., Inc.*, 540 F. 2d 591, 598–600 (CA3 1976); cf. Fed. Rule Civ. Proc. 56 (g) (attorney's fees to be awarded against party filing summary judgment affidavits "in bad faith or solely for the purpose of delay"); Fed. Rule Civ. Proc. 37 (a) (4) (motions to compel discovery; prevailing party may recover attorney's fees). The award vindicates judicial authority without resort to the more drastic sanctions available for contempt of court and makes the prevailing party whole for expenses caused by his opponent's obstinacy. Cf. *First Nat. Bank* v. *Dunham,* 471 F. 2d 712 (CA8 1973). Of course, fees can also be awarded as part of a civil contempt penalty. See, *e. g., Toledo Scale Co.*

ing that the fees be paid from public funds violates the Eleventh Amendment.

In the landmark decision in *Ex parte Young,* 209 U. S. 123, the Court held that, although prohibited from giving orders directly to a State, federal courts could enjoin state officials in their official capacities. And in *Edelman* v. *Jordan,* 415 U. S. 651, when the Court held that the Amendment grants the States an immunity from retroactive monetary relief, it reaffirmed the principle that state officers are not immune from prospective injunctive relief. Aware that the difference between retroactive and prospective relief "will not in many instances be that between day and night," *id.,* at 667, the Court emphasized in *Edelman* that the distinction did not immunize the States from their obligation to obey costly federal-court orders. The cost of compliance is "ancillary" to the prospective order enforcing federal law. *Id.,* at 668.[15] The line between retroactive and prospective relief cannot be so rigid that it defeats the effective enforcement of prospective relief.

The present case requires application of that principle. In exercising their prospective powers under *Ex parte Young* and *Edelman* v. *Jordan,* federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced. Many of the court's most effective enforcement weapons involve financial penalties. A criminal contempt prosecution for "resistance to [the court's] lawful . . . order" may result in a jail term or a fine. 18 U. S. C. § 401 (1976 ed.). Civil contempt proceedings may yield a conditional jail term or fine. *United States* v.

v. *Computing Scale Co.,* 261 U. S. 399; *Signal Delivery Service, Inc.* v. *Highway Truck Drivers,* 68 F. R. D. 318 (ED Pa. 1975).

[15] "Ancillary" costs may be very large indeed. Last Term, for example, this Court rejected an Eleventh Amendment defense and approved an injunction ordering a State to pay almost $6 million to help defray the costs of desegregating the Detroit school system. *Milliken* v. *Bradley,* 433 U. S., at 293 (POWELL, J., concurring in judgment).

*Mine Workers,* 330 U. S. 258, 305. Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance. *Id.,* at 304; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418. If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance. The principles of federalism that inform Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail.[16] The less intrusive power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief.

In this case, the award of attorney's fees for bad faith served the same purpose as a remedial fine imposed for civil contempt. It vindicated the District Court's authority over a recalcitrant litigant. Compensation was not the sole motive for the award; in setting the amount of the fee, the court said that it would "make no effort to adequately compensate counsel for the work that they have done or for the time that they have spent on the case." 410 F. Supp., at 285. The court did allow a "substantial" fee, however, because "the allowance thereof may incline the Department to act in such a manner that further protracted litigation about the prisons will not be necessary." *Ibid.*[17] We see no reason to distin-

---

[16] See Note, Attorneys' Fees and the Eleventh Amendment, 88 Harv. L. Rev. 1875, 1892 (1975).

[17] That the award had a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compensates a private party for the consequences of a contemnor's disobedience. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418. Moreover, the Court has approved federal rulings requiring a State to support programs that compensate for past misdeeds, saying: "That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system. We therefore hold that such prospective relief is not barred by the Eleventh Amendment." *Milliken* v. *Bradley, supra,* at 290 (emphasis in original). The award of attorney's fees against a State disregarding a

guish this award from any other penalty imposed to enforce a prospective injunction.[18]  Hence the substantive protections of the Eleventh Amendment do not prevent an award of attorney's fees against the Department's officers in their official capacities.

Instead of assessing the award against the defendants in their official capacities, the District Court directed that the fees are "to be paid out of Department of Correction funds." *Ibid.*  Although the Attorney General objects to the form of the order,[19] no useful purpose would be served by requiring that it be recast in different language.  We have previously approved directives that were comparable in their actual impact on the State without pausing to attach significance to the language used by the District Court.[20]  Even if it might have

federal order stands on the same footing; like other enforcement powers, it is integral to the court's grant of prospective relief.

[18] The Attorney General has not argued that this award was so large or so unexpected that it interfered with the State's budgeting process. Although the Eleventh Amendment does not prohibit attorney's fees awards for bad faith, it may counsel moderation in determining the size of the award or in giving the State time to adjust its budget before paying the full amount of the fee.  Cf. *Edelman* v. *Jordan*, 415 U. S. 651, 666 n. 11. In this case, however, the timing of the award has not been put in issue; nor has the State claimed that the award was larger than necessary to enforce the court's prior orders.

[19] We do not understand the Attorney General to urge that the fees should have been awarded against the officers personally; that would be a remarkable way to treat individuals who have relied on the Attorney General to represent their interests throughout this litigation.

[20] In *Milliken* v. *Bradley, supra,* we affirmed an order requiring a state treasurer to pay a substantial sum to another litigant, even though the District Court's opinion explicitly recognized that "this remedial decree will be paid for by the taxpayers of the City of Detroit and the State of Michigan," App. to Pet. for Cert. in *Milliken* v. *Bradley,* O. T. 1976, No. 76–447, pp. 116a–117a, and even though the Court of Appeals, in affirming, stated that "the District Court ordered that the State and Detroit Board each pay one-half the costs" of relief.  *Bradley* v. *Milliken,* 540 F. 2d 229, 245 (CA6 1976).

been better form to omit the reference to the Department of Correction, the use of that language is surely not reversible error.

## B. The Court of Appeals Award

Petitioners, as the losing litigants in the Court of Appeals, were ordered to pay an additional $2,500 to counsel for the prevailing parties "for their services on this appeal." 548 F. 2d, at 743. The order does not expressly direct the Department of Correction to pay the award, but since petitioners are sued in their official capacities, and since they are represented by the Attorney General, it is obvious that the award will be paid with state funds. It is also clear that this order is not supported by any finding of bad faith. It is founded instead on the provisions of the Civil Rights Attorney's Fees Awards Act of 1976. Pub. L. No. 94–559, 90 Stat. 2641, 42 U. S. C. § 1988 (1976 ed.). The Act declares that, in suits under 42 U. S. C. § 1983 and certain other statutes, federal courts may award prevailing parties reasonable attorney's fees "as part of the costs."[21]

As this Court made clear in *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, Congress has plenary power to set aside the States' immunity from retroactive relief in order to enforce the Fourteenth Amendment. When it passed the Act, Congress undoubtedly intended to exercise that power and to authorize fee awards

---

[21] The Act declares:

"In any action or proceeding to enforce a provision of §§ 1977, 1978, 1979, 1980, and 1981 of the Revised Statutes [42 U. S. C. §§ 1981–1983, 1985, 1986], title IX of Public Law 92–318 [20 U. S. C. § 1681 *et seq.* (1976 ed.)], or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code [26 U. S. C. § 1 *et seq.* (1976 ed.)], or title VI of the Civil Rights Act of 1964 [42 U. S. C. § 2000d *et seq.*], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 90 Stat. 2641.

payable by the States when their officials are sued in their official capacities. The Act itself could not be broader. It applies to "any" action brought to enforce certain civil rights laws. It contains no hint of an exception for States defending injunction actions; indeed, the Act primarily applies to laws passed specifically to restrain state action. See, *e. g.*, 42 U. S. C. § 1983.

The legislative history is equally plain: "[I]t is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party)." S. Rep. No. 94–1011, p. 5 (1976) (footnotes omitted). The House Report is in accord: "The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities." H. R. Rep. No. 94–1558, p. 7 (1976). The Report adds in a footnote that: "Of course, the 11th Amendment is not a bar to the awarding of counsel fees against state governments. *Fitzpatrick* v. *Bitzer*." *Id.*, at 7 n. 14. Congress' intent was expressed in deeds as well as words. It rejected at least two attempts to amend the Act and immunize state and local governments from awards.[22]

The Attorney General does not quarrel with the rule established in *Fitzpatrick* v. *Bitzer, supra.* Rather, he argues that these plain indications of legislative intent are not enough. In his view, Congress must enact express statutory language making the States liable if it wishes to abrogate their immunity.[23] The Attorney General points out that this Court has

---

[22] See 122 Cong. Rec. 31832–31835 (1976) (amendment of Sen. Helms); *id.*, at 32296 and 32396–32397 (amendment of Sen. Allen). See aso *id.*, at 32931 (amendment of Sen. William Scott).

[23] The Attorney General also contends that the fee award should not apply to cases, such as this one, that were pending when the Act was passed

sometimes refused to impose retroactive liability on the States in the absence of an extraordinarily explicit statutory mandate. See *Employees* v. *Missouri Public Health & Welfare Dept.*, 411 U. S. 279; see also *Edelman* v. *Jordan,* 415 U. S. 651. But these cases concern retroactive liability for prelitigation conduct rather than expenses incurred in litigation seeking only prospective relief.

The Act imposes attorney's fees "as part of the costs." Costs have traditionally been awarded without regard for the States' Eleventh Amendment immunity. The practice of awarding costs against the States goes back to 1849 in this Court. See *Missouri* v. *Iowa,* 7 How. 660, 681; *North Dakota* v. *Minnesota,* 263 U. S. 583 (collecting cases). The Court has never viewed the Eleventh Amendment as barring such awards, even in suits between States and individual litigants.[24]

in 1976. But the legislative history of the Act, as well as this Court's general practice, defeats this argument. The House Report declared: "In accordance with applicable decisions of the Supreme Court, the bill is intended to apply to all cases pending on the date of enactment . . . ." H. R. Rep. No. 94–1558, p. 4 n. 6 (1976). See also *Bradley* v. *Richmond School Board,* 416 U. S. 696.

[24] While the decisions allowing the award of costs against States antedate the line drawn between retroactive and prospective relief in *Edelman* v. *Jordan,* 415 U. S. 651, such awards do not seriously strain that distinction. Unlike ordinary "retroactive" relief such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court. Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief. (An award of costs will almost invariably be incidental to an award of prospective relief, for costs are generally awarded only to prevailing parties, see Fed. Rule Civ. Proc. 54 (d), and only prospective relief can be successfully pursued by an individual in a suit against a State.) Moreover, like the power to award attorney's fees for litigating in bad faith, the power to assess costs is an important and well-recognized tool used to restrain the behavior of parties during litigation. See, *e. g.,* Rule 37 (b) (costs may be awarded for failure to obey discovery order); Rule 30 (g) (costs may be awarded for failure to attend deposition or for failure to serve subpoena). When

In *Fairmont Creamery Co.* v. *Minnesota,* 275 U. S. 70, the State challenged this Court's award of costs, but we squarely rejected the State's claim of immunity. Far from requiring an explicit abrogation of state immunity, we relied on a statutory mandate that was entirely silent on the question of state liability.[25] The power to make the award was supported by "the inherent authority of the Court in the orderly administration of justice as between all parties litigant." *Id.,* at 74. A federal court's interest in orderly, expeditious proceedings "justifies [it] in treating the state just as any other litigant and in imposing costs upon it" when an award is called for. *Id.,* at 77.[26]

Just as a federal court may treat a State like any other litigant when it assesses costs, so also may Congress amend its definition of taxable costs and have the amended class of costs apply to the States, as it does to all other litigants, without expressly stating that it intends to abrogate the States' Eleventh Amendment immunity. For it would be absurd to require an express

---

a State defends a suit for prospective relief, it is not exempt from the ordinary discipline of the courtroom.

[25] "If specific statutory authority [for an award of costs] is needed, it· is found in § 254 of the Judicial Code . . . . It provides that there shall be 'taxed against the losing party in each and every cause pending in the Supreme Court' the cost of printing the record, except when the judgment is against the United States. This exception of the United States in the section with its emphatic inclusion of every other litigant shows that a state as litigant must pay the costs of printing, if it loses, in every case, civil or criminal. These costs constitute a large part of all the costs. The section certainly constitutes *pro tanto* statutory authority to impose costs generally against a state if defeated." 275 U. S., at 77.

[26] Because the interest in orderly and evenhanded justice is equally pressing in lower courts, *Fairmont Creamery* has been widely understood as foreclosing any Eleventh Amendment objection to assessing costs against a State in all federal courts. See, *e. g., Skehan* v. *Board of Trustees,* 538 F. 2d 53, 58 (CA3 1976) (en banc); *Utah* v. *United States,* 304 F. 2d 23 (CA10 1962); *United States ex rel. Griffin* v. *McMann,* 310 F. Supp. 72 (EDNY 1970).

reference to state litigants whenever a filing fee, or a new item, such as an expert witness' fee, is added to the category of taxable costs.[27]

There is ample precedent for Congress' decision to authorize an award of attorney's fees as an item of costs. In England, costs "as between solicitor and client," *Sprague* v. *Ticonic Nat. Bank*, 307 U. S. 161, 167, are routinely taxed today, and have been awarded since 1278. *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 n. 18. In America, although fees are not routinely awarded, there are a large number of statutory and common-law situations in which allowable costs include counsel fees.[28] Indeed, the federal statutory definition of costs, which was enacted before the Civil War and which remains in effect today, includes certain fixed attorney's fees as recoverable costs.[29] In *Fairmont Creamery* itself, the Court awarded these statutory attorney's fees against the

---

[27] This conclusion is consistent with the reasons for requiring a formal indication of Congress' intent to abrogate the States' Eleventh Amendment immunity. The requirement insures that Congress has not imposed "enormous fiscal burdens on the States" without careful thought. *Employees* v. *Missouri Public Health & Welfare Dept.*, 411 U. S. 279, 284. See Tribe, Intergovernmental Immunities in Litigation, Taxation and Regulation, 89 Harv. L. Rev. 682, 695 (1976). But an award of costs—limited as it is to partially compensating a successful litigant for the expense of his suit—could hardly create any such hardship for a State. Thus we do not suggest that our analysis would be the same if Congress were to expand the concept of costs beyond the traditional category of litigation expenses.

[28] In 1975, we listed 29 statutes allowing federal courts to award attorney's fees in certain suits. See *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S., at 260-261, n. 33. Some of these statutes define attorney's fees as an element of costs, while others separate fees from other taxable costs. Compare 42 U. S. C. § 2000a-3 (b) with 29 U. S. C. § 216 (b) (1970 ed., Supp. V).

[29] See 28 U. S. C. § 1923 (a) ($100 in fees for admiralty appeals involving more than $5,000). Inflation has now made the awards merely nominal, but the principle of allowing such awards against all parties has undiminished force.

State of Minnesota along with other taxable costs,[30] even though the governing statute said nothing about state liability. It is much too late to single out attorney's fees as the one kind of litigation cost whose recovery may not be authorized by Congress without an express statutory waiver of the States' immunity.[31]

---

[30] File of the Clerk of this Court in *Fairmont Creamery Co.* v. *Minnesota*, O. T. 1926, No. 725.

[31] The Attorney General argues that the statute itself must expressly abrogate the States' immunity from retroactive liability, relying on *Employees* v. *Missouri Public Health & Welfare Dept., supra.* Even if we were not dealing with an item such as costs, this reliance would be misplaced. In *Employees,* the Court refused to permit individual backpay suits against state institutions because the Court "found not a word in the history of the [statute] to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts." 411 U. S., at 285. The Court was careful to add, moreover, that its reading of the law did not make the statute's inclusion of state institutions meaningless. Because the Secretary of Labor was empowered to bring suit against violators, the amendment covering state institutions gave him authority to enforce the statute against them. *Id.,* at 285–286.

The present Act, in contrast, has a history focusing directly on the question of state liability; Congress considered and firmly rejected the suggestion that States should be immune from fee awards. Moreover, the Act is not part of an intricate regulatory scheme offering alternative methods of obtaining relief. If the Act does not impose liability for attorney's fees on the States, it has no meaning with respect to them. Finally, the claims asserted in *Employees* and in *Edelman* v. *Jordan,* 415 U. S. 651, were based on a statute rooted in Congress' Art. I power. See *Employees, supra,* at 281 (claim based on Fair Labor Standards Act, 29 U. S. C. § 201 *et seq.*); *Edelman* v. *Jordan, supra,* at 674 (underlying claim based on Social Security Act provisions dealing with aid to aged, blind, and disabled, 42 U. S. C. §§ 1381–1385). In this case, as in *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, the claim is based on a statute enacted to enforce the Fourteenth Amendment. As we pointed out in *Fitzpatrick:*

"[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. . . . When Congress acts pursuant to

Finally, the Attorney General argues that, even if attorney's fees may be awarded against a State, they should not be awarded in this case, because neither the State nor the Department is expressly named as a defendant. Although the Eleventh Amendment prevented respondents from suing the State by name, their injunctive suit against prison officials was, for all practical purposes, brought against the State. The actions of the Attorney General himself show that. His office has defended this action since it began. See *Holt I*, 300 F. Supp., at 826. The State apparently paid earlier fee awards; and it was the State's lawyers who decided to bring this appeal, thereby risking another award.[32]

---

§ 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority." *Id.*, at 456.

Cf. *National League of Cities* v. *Usery*, 426 U. S. 833, 852 n. 17. Applying the standard appropriate in a case brought to enforce the Fourteenth Amendment, we have no doubt that the Act is clear enough to authorize the award of attorney's fees payable by the State.

[32] The Attorney General is hardly in a position to argue that the fee awards should be borne not by the State, but by individual officers who have relied on his office to protect their interests throughout the litigation. Nonetheless, our dissenting Brethren would apparently force these officers to bear the award alone. The Act authorizes an attorney's fee award even though the appeal was not taken in bad faith; no one denies that. The Court of Appeals' award is thus proper, and the only question is who will pay it. In the dissenters' view, the Eleventh Amendment protects the State from liability. But the State's immunity does not extend to the individual officers. The dissenters would apparently leave the officers to pay the award; whether the officials would be reimbursed is a decision that "may . . . safely be left to the State involved." *Post*, at 716 (REHNQUIST, J., dissenting). This is manifestly unfair when, as here, the individual officers have no personal interest in the conduct of the State's litigation, and it defies this Court's insistence in a related context that imposing personal liability in the absence of bad faith may cause state officers to "exercise their discretion with undue timidity." *Wood* v. *Strickland*, 420 U. S. 308, 321.

Like the Attorney General, Congress recognized that suits brought against individual officers for injunctive relief are for all practical purposes suits against the State itself. The legislative history makes it clear that in such suits attorney's fee awards should generally be obtained "either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party)." S. Rep. No. 94–1011, p. 5 (1976). Awards against the official in his individual capacity, in contrast, were not to be affected by the statute; in injunctive suits they would continue to be awarded only "under the traditional bad faith standard recognized by the Supreme Court in *Alyeska.*" *Id.,* at 5 n. 7. There is no indication in this case that the named defendants litigated in bad faith before the Court of Appeals. Consequently, the Department of Correction is the entity intended by Congress to bear the burden of the counsel-fees award.

The judgment of the Court of Appeals is accordingly affirmed.

*It is so ordered.*

Mr. Justice Brennan, concurring.

I join fully in the opinion of the Court and write separately only to answer points made by Mr. Justice Powell.

I agree with the Court that there is no reason in this case to decide more than whether 42 U. S. C. § 1988 (1976 ed.), itself authorizes awards of attorney's fees against the States. Mr. Justice Powell takes the view, however, that unless 42 U. S. C. § 1983 also authorizes damages awards against the States, the requirements of the Eleventh Amendment are not met. Citing *Edelman* v. *Jordan,* 415 U. S. 651 (1974), he concludes that § 1983 does not authorize damages awards against the State and, accordingly, that § 1988 does not either. There are a number of difficulties with this syllogism, but the most striking is its reliance on *Edelman* v. *Jordan,* a case whose foundations would seem to have been seriously under-

mined by our later holdings in *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), and *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978).

It cannot be gainsaid that this Court in *Edelman* rejected the argument that 42 U. S. C. § 1983 "was intended to create a waiver of a State's Eleventh Amendment immunity merely because an action could be brought under that section against state officers, rather than against the State itself." 415 U. S., at 676–677. When *Edelman* was decided, we had affirmed monetary awards against the States only when they had consented to suit or had waived their Eleventh Amendment immunity. See, *e. g., Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275 (1959); *Parden* v. *Terminal R. Co.*, 377 U. S. 184 (1964); *Employees* v. *Missouri Public Health & Welfare Dept.*, 411 U. S. 279 (1973). In *Edelman*, we summarized the rule of our cases as follows: The "question of waiver or consent under the Eleventh Amendment was found in [our] cases to turn on whether Congress had intended to abrogate the immunity in question, and whether the State by its participation in [a regulated activity] authorized by Congress had in effect consented to the abrogation of [Eleventh Amendment] immunity." 415 U. S., at 672. At the very least, such consent could not be found unless Congress had authorized suits against "a class of defendants which literally includes States." *Ibid.* It was a short jump from that proposition, to the conclusion that § 1983—which was then thought to include only natural persons among those who could be party defendants, see *Monroe* v. *Pape*, 365 U. S. 167, 187–191 (1961)—was not in the class of statutes that might lead to a waiver of Eleventh Amendment immunity. This is best summed up by MR. JUSTICE REHNQUIST, the author of *Edelman*, in his opinion for the Court in *Fitzpatrick* v. *Bitzer*, *supra*:

"We concluded that none of the statutes relied upon by plaintiffs in *Edelman* contained any authorization by

Congress to join a State as defendant. The Civil Rights Act of 1871, 42 U. S. C. § 1983, had been held in *Monroe v. Pape,* 365 U. S. 167, 187–191 (1961), to exclude cities and other municipal corporations from its ambit; that being the case, it could not have been intended to include States as parties defendant." 427 U. S., at 452.

But time has not stood still. Two Terms ago, we decided *Fitzpatrick* v. *Bitzer,* which for the first time in the recent history of the Court asked us to decide "the question of the relationship between the Eleventh Amendment and the enforcement power granted to Congress under § 5 of the Fourteenth Amendment."[1]  *Id.,* at 456. There we concluded that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Ibid.* (Citation omitted.) And we went on to hold:

"Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Ibid.*

Then, in *Monell* v. *New York City Dept. of Social Services, supra,* decided only weeks ago, we held that the Congress which passed the Civil Rights Act of 1871, now § 1983—a statute enacted pursuant to § 5 of the Fourteenth Amendment, see 436 U. S., at 665—"*did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.,* at 690. This holding alone would appear to be enough to vitiate the vitality of *Fitzpatrick*'s explanation of *Edelman.*[2]

---

[1] As *Fitzpatrick* noted, this issue had been before the Court in *Ex parte Virginia,* 100 U. S. 339 (1880).

[2] It can also be questioned whether, had Congress meant to exempt municipalities from liability under § 1983, it would necessarily follow that

Moreover, central to the holding in *Monell* was the conclusion that the Act of Feb. 25, 1871, ch. 71, § 2, 16 Stat. 431, provided a definition of the word "person" used to describe the class of defendants in § 1983 suits. 436 U. S., at 688. Although we did not in *Monell* have to consider whether § 1983 as properly construed makes States liable in damages for their constitutional violations, the conclusion seems inescapable that, at the very least, § 1983 includes among possible defendants "a class . . . which literally includes States." *Edelman* v. *Jordan*, 415 U. S., at 672. This follows immediately from the language of the Act of Feb. 25, 1871:

"[I]n all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense . . . ."

The phrase "bodies politic and corporate" is now, and certainly would have been in 1871, a synonym for the word "State." See, *e. g., United States* v. *Maurice*, 26 F. Cas. 1211, 1216 (No. 15,747) (CC Va. 1823) (Marshall, C. J.) ("The United States is a government and, consequently, a body politic and corporate"). See also *Pfizer Inc.* v. *Government of India*, 434 U. S. 308 (1978).

Given our holding in *Monell*, the essential premise of our *Edelman* holding—that no statute involved in *Edelman* authorized suit against "a class of defendants which literally includes States," 415 U. S., at 672—would clearly appear to be no longer true. Moreover, given *Fitzpatrick*'s holding that Congress has plenary power to make States liable in damages when it acts pursuant to § 5 of the Fourteenth Amendment, it is surely at least an open question whether § 1983 properly construed does not make the States liable for relief of all kinds, notwithstanding the Eleventh Amendment. Whether this is

---

Congress also meant to exempt States. See *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 673–674, n. 30 (1978).

in fact so, must of course await consideration in an appropriate case.[3]

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.*

While I join Parts I[1] and II–A of the Court's opinion, I cannot subscribe to Part II–B's reading of the Eleventh Amendment as permitting counsel-fee awards against the State on the authority of a statute that concededly does not effect "an express statutory waiver of the States' immunity." *Ante,* at 698.

*Edelman* v. *Jordan,* 415 U. S. 651, 676–677 (1974), rejected the argument that 42 U. S. C. § 1983 "was intended to create a waiver of the State's Eleventh Amendment immunity merely because an action could be brought under that section against state officers, rather than against the State itself." In a § 1983

---

[3] As I understand MR. JUSTICE POWELL's objection to the Court's opinion, it rests squarely on the proposition that a clear statement to make States liable for damages cannot be found in legislative history but only on the face of a statute. See *post,* at 705–706. In § 1983 and the Act of Feb. 25, 1871, we have a statute that on its face applies to state defendants, but now MR. JUSTICE POWELL tells us that this is not enough because there is still an absence of "congressional purpose in 1871 to abrogate the protections of the Eleventh Amendment." *Post,* at 709 n. 6. I suppose that this means either that no statute can meet the Eleventh Amendment clear-statement test or, alternatively, that MR. JUSTICE POWELL has some undisclosed rule as to when legislative history may be taken into account that works only to defeat state liability.

*MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST join this opinion to the extent it dissents from the opinion and judgment of the Court.

[1] The principles emphasized by MR. JUSTICE REHNQUIST, *post,* at 711, as to the limitation of equitable remedies are settled. See *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406 (1977); *Milliken* v. *Bradley,* 433 U. S. 267 (1977). On the extraordinary facts of this case, however, I agree with the Court that the 30-day limitation on punitive isolation was within the bounds of the District Court's discretion in fashioning appropriate relief. It also is evident from the Court's opinion, see *ante,* at 688, that this limitation will have only a minimal effect on prison administration, an area of responsibility primarily reserved to the States.

action "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, . . . and may not include a retroactive award which requires the payment of funds from the state treasury." 415 U. S., at 677 (citations omitted). There is no indication in the language of the Civil Rights Attorney's Fees Awards Act of 1976 (Act), Pub. L. No. 94–559, 90 Stat. 2641, 42 U. S. C. § 1988 (1976 ed.), that Congress sought to overrule that holding.[2] In this case, as in *Edelman,* "the threshold fact of congressional authorization to sue a class of defendants which *literally* includes States is wholly absent." 415 U. S., at 672 (emphasis supplied). Absent such authorization, grounded in statutory language sufficiently clear to alert every voting Member of Congress of the constitutional implications of particular legislation, we undermine the values of federalism served by the Eleventh Amendment by inferring from congressional silence an intent to "place new or even enormous fiscal burdens on the States." *Employees* v. *Missouri Public Health & Welfare Dept.,* 411 U. S. 279, 284 (1973).

The Court notes that the Committee Reports and the defeat of two proposed amendments indicate a purpose to authorize counsel-fee awards against the States. *Ante,* at 694. That evidence might provide persuasive support for a finding of "waiver" if this case involved "a congressional enactment which by its terms authorized suit by designated plaintiffs against a general class of defendants which literally included

---

[2] In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), the Court held that "the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.,* at 690. We noted, however, that there was no "basis for concluding that the Eleventh Amendment is a bar to municipal liability," and that our holding was "limited to local government units which are not considered part of the State for Eleventh Amendment purposes." *Id.,* at 690, and n. 54 (emphasis in original).

States or state instrumentalities." *Edelman, supra,* at 672. Compare *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 452 (1976), with *Employees, supra,* at 283, 284–285.[3] But in this sensitive area of conflicting interests of constitutional dimension, we should not permit items of legislative history to substitute for explicit statutory language. The Court should be "hesitant to presume general congressional awareness," *SEC* v. *Sloan,* 436 U. S. 103, 121 (1978), of Eleventh Amendment consequences of a statute that does not make express provision for monetary recovery against the States.[4]

---

[3] Although *Fitzpatrick* states that the "prerequisite" of "congressional authorization . . . to sue the State as employer" was found "wanting in *Employees,*" 427 U. S., at 452, this reference is to the Court's conclusion in *Employees* that notwithstanding the literal inclusion of the States as statutory employers, in certain contexts, there was "not a word in the history of the [statute] to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts." 411 U. S., at 285. See *Edelman,* 415 U. S., at 672.

While it has been suggested that "[t]he legislative changes that made state governments liable under Title VII closely paralleled the changes that made state governments liable under the Fair Labor Standards Act," Baker, Federalism and the Eleventh Amendment, 48 U. Colo. L. Rev. 139, 171 n. 152 (1977), comparing *Fitzpatrick,* 427 U. S., at 449 n. 2, with *Employees,* 411 U. S., at 282–283, the statute considered in *Fitzpatrick* made explicit reference to the availability of a *private* action against state and local governments in the event the Equal Employment Opportunity Commission or the Attorney General failed to bring suit or effect a conciliation agreement. Equal Opportunity Employment Act of 1972, 86 Stat. 104, 42 U. S. C. § 2000e–5 (f)(1) (1970 ed., Supp. V); see H. R. Rep. No. 92–238, pp. 17–19 (1971); S. Rep. No. 92–415, pp. 9–11 (1971); S. Conf. Rep. No. 92–681, pp. 17–18 (1972); H. R. Conf. Rep. No. 92–899, pp. 17–18 (1972).

[4] "By making a law unenforceable against the states unless a contrary intent were apparent *in the language of the statute,* the clear statement rule . . . ensure[s] that attempts to limit state power [are] unmistakable, thereby structuring the legislative process to allow the centrifugal forces in Congress the greatest opportunity to protect the states' interests." Tribe, Intergovernmental Immunities in Litigation, Taxation, and Regu-

The Court maintains that the Act presents a special case because (i) it imposes attorney's fees as an element of costs that traditionally have been awarded without regard to the States' constitutional immunity from monetary liability, and (ii) Congress acted pursuant to its enforcement power under § 5 of the Fourteenth Amendment, as contrasted with its power under more general grants such as the Commerce Clause. I find neither ground a persuasive justification for dilution of the "clear statement" rule.

Notwithstanding the limitations of the Court's first ground of justification, see *ante,* at 697 n. 27, I am unwilling to ignore otherwise applicable principles simply because the statute in question imposes substantial monetary liability as an element of "costs." Counsel fees traditionally have not been part of the routine litigation expenses assessed against parties in American courts. Cf. *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975); *Arcambel* v. *Wiseman,* 3 Dall. 306 (1796). Quite unlike those routine expenses, an award of counsel fees may involve substantial sums and is not a charge intimately related to the mechanics of the litigation. I therefore cannot accept the Court's assumption that counsel-fee awards are part of "the ordinary discipline of the courtroom." *Ante,* at 696 n. 24.[5]

lation: Separation of Powers Issues in Controversies About Federalism, 89 Harv. L. Rev. 682, 695 (1976) (emphasis supplied).

[5] The Court places undue reliance on *Fairmont Creamery Co.* v. *Minnesota,* 275 U. S. 70 (1927), in support of its holding. That decision holds that no common-law bar of sovereign immunity prevents the imposition of costs against the State "when [it is] a party to litigation in this Court . . . ." *Id.,* at 74. In addition to the fact that the State was a party in the litigation, and that there is no discussion of counsel fees, *Fairmont Creamery* "did not mention the eleventh amendment. Furthermore, the Court had held long before that when an individual appeals a case initiated by a state to the Supreme Court, that appeal does not fall within the eleventh amendment's prohibition of suit 'commenced or prosecuted against' the states." Note, Attorneys' Fees and the Eleventh Amendment, 88 Harv. L. Rev. 1875, 1890 (1975).

Moreover, counsel-fee awards cannot be viewed as having the kind of "ancillary effect on the state treasury," *Edelman*, 415 U. S., at 668, that avoids the need for an explicit waiver of Eleventh Amendment protections. As with damages and restitutory relief, an award of counsel fees could impose a substantial burden on the State to make unbudgeted disbursements to satisfy an obligation stemming from past (as opposed to post-litigation) activities. It stretches the rationale of *Edelman* beyond recognition to characterize such awards as "the necessary result of compliance with decrees which by their terms [are] prospective in nature." *Ibid.* In the case of a purely prospective decree, budgeting can take account of the expenditures entailed in compliance, and the State retains some flexibility in implementing the decree, which may reduce the impact on the state fisc. In some situations fiscal considerations may induce the State to curtail the activity triggering the constitutional obligation. Here, in contrast, the State must satisfy a potentially substantial liability without the measure of flexibility that would be available with respect to prospective relief.

The Court's second ground for application of a diluted "clear statement" rule stems from language in *Fitzpatrick* recognizing that "[w]hen Congress acts pursuant to § 5" of the Fourteenth Amendment, "it is exercising [legislative] authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority," 427 U. S., at 456. I do not view this language as overruling, by implication, *Edelman's* holding that no waiver is present in § 1983 [6]—the quintessential Fourteenth Amend-

---

[6] MR. JUSTICE BRENNAN's concurring opinion asserts that the Court's holding in *Edelman* has been undermined, *sub silentio*, by *Fitzpatrick* and the re-examination of the legislative history of § 1983 undertaken in *Monell*. The language in question from *Fitzpatrick* was not essential to the Court's holding in that case. Moreover, this position ignores the fact that *Edelman* rests squarely on the Eleventh Amendment immunity, without

ment measure—or disturbing the vitality of the "threshold [requirement] of congressional authorization to sue a class of defendants which literally includes States," 415 U. S., at 672.[7]

adverting in terms to the treatment of the legislative history in *Monroe* v. *Pape*, 365 U. S. 167 (1961). And there is nothing in *Monroe* itself that supports the proposition that § 1983 was "thought to include only natural persons among those who could be party defendants . . . ." *Ante*, at 701. The *Monroe* Court held that because the 1871 Congress entertained doubts as to its "power . . . to impose civil liability on municipalities," the Court could not "believe that the word 'person' was used in this particular Act to include them." 365 U. S., at 190, 191. As the decision in *Monell* itself illustrates, see n. 2, *supra*, the statutory issue of municipal liability is quite independent of the question of the State's constitutional immunity.

Mr. Justice Brennan's opinion appears to dispense with the "clear statement" requirement altogether, a position that the Court does not embrace today. It relies on the reference to "bodies politic" in the "Dictionary Act," Act of Feb. 25, 1871, 16 Stat. 431, as adequate to override the States' constitutional immunity, even though there is no evidence of a congressional purpose in 1871 to abrogate the protections of the Eleventh Amendment. But the Court's rulings in *Edelman* and *Employees* are rendered obsolete if provisions like the "Dictionary Act" are all that is necessary to expose the States to monetary liability. After a century of § 1983 jurisprudence, in which States were not thought to be liable in damages, *Edelman* made clear that the 1871 measure does not override the Eleventh Amendment. I would give force to our prior Eleventh Amendment decisions by requiring explicit legislation on the point.

[7] The Court suggests that the "dissenting Brethren would apparently force [the individual] officers to bear the award alone." *Ante*, at 699 n. 32. It is not clear to me that this issue, not fairly embraced within the questions presented, is before us. Moreover, there is no suggestion in the opinion below that the Court of Appeals intended that its award of fees for "services on this appeal" would be paid by the individual petitioners, in the event the Eleventh Amendment were found to bar an award against the Department of Correction. See 548 F. 2d 740, 742–743 (1977). But even if the question properly were before this Court, there is nothing in the Act that requires the routine imposition of counsel-fee liability on anyone. As we noted in *Monell*, the Act "allows prevailing parties (*in the discretion of the court*) in § 1983 suits to obtain attorney's fees from the losing parties . . . ." 436 U. S., at 698–699 (emphasis supplied). Congress deliberately rejected a mandatory statute, in favor of "a more moderate

Because explicit authorization "to join a State as defendant," *Fitzpatrick,* 427 U. S., at 452, is absent here, and because every part of the Act can be given meaning without ascribing to Congress an intention to override the Eleventh Amendment immunity,[8] I dissent from Part II–B of the Court's opinion.

Mr. Justice Rehnquist, dissenting.*

The Court's affirmance of a District Court's injunction against a prison practice which has not been shown to violate the Constitution can only be considered an aberration in light of decisions as recently as last Term carefully defining the remedial discretion of the federal courts. *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406 (1977); *Milliken* v. *Bradley,* 433 U. S. 267 (1977) (*Milliken II*). Nor are any of the several theories which the Court advances in support of its affirmance of the assessment of attorney's fees against the taxpayers of Arkansas sufficiently convincing to overcome the prohibition of the Eleventh Amendment. Accordingly, I dissent.

---

approach [which left] the matter to the discretion of the judge, guided of course by the case law interpreting similar attorney's fee provisions." H. R. Rep. No. 94–1558, p. 8 (1976). Whether or not the standard of cases like *Wood* v. *Strickland,* 420 U. S. 308 (1975), was rejected with respect to counsel-fee liability, see H. R. Rep. No. 94–1558, *supra,* at 9, and n. 17, neither the Act nor its legislative history prevents a court from taking into account the personal culpability of the individual officer where an award against the government entity would be barred by the Eleventh Amendment.

[8] I do not understand the Court's observation that "[i]f the Act does not impose liability for attorney's fees on the States, it has no meaning with respect to them." *Ante,* at 698 n. 31. Significantly, the Court does not say that any part of the Act would be rendered meaningless without finding an Eleventh Amendment waiver. Cf. *Employees,* 411 U. S., at 285–286.

*Mr. Justice White joins Part II of this opinion.

## I

No person of ordinary feeling could fail to be moved by the Court's recitation of the conditions formerly prevailing in the Arkansas prison system. Yet I fear that the Court has allowed itself to be moved beyond the well-established bounds limiting the exercise of remedial authority by the federal district courts. The purpose and extent of that discretion in another context were carefully defined by the Court's opinion last Term in *Milliken II, supra,* at 280–281:

> "In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. [1,] 16 [(1971)]. The remedy must therefore be related to 'the *condition* alleged to offend the Constitution . . . .' *Milliken* [v. *Bradley*], 418 U. S. [717,] 738 [(1974)]. Second, the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' *Id.,* at 746. Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." (Footnotes omitted.) [1]

---

[1] The Court suggests, *ante,* at 687 n. 9, that its holding is consistent with *Milliken II,* because it "was not remedying the present effects of a violation in the past. It was seeking to bring an ongoing violation to an immediate halt." This suggestion is wide of the mark. Whether exercising its authority to "remed[y] the present effects of a violation in the past," or "seeking to bring an ongoing violation to an immediate halt," the court's remedial authority remains circumscribed by the language quoted in the text from *Milliken II.* If anything, less ingenuity and discretion would appear to be required to "bring an ongoing violation to an immediate halt" than in "remedying the present effects of a violation in the past." The difficulty with the Court's position is that it quite properly refrains

712

The District Court's order limiting the maximum period of punitive isolation to 30 days in no way relates to any condition found offensive to the Constitution. It is, when stripped of descriptive verbiage, a prophylactic rule, doubtless well designed to assure a more humane prison system in Arkansas, but not complying with the limitations set forth in *Milliken II, supra.* Petitioners do not dispute the District Court's conclusion that the overcrowded conditions and the inadequate diet provided for those prisoners in punitive isolation offended the Constitution, but the District Court has ordered a cessation of those practices. The District Court found that the confinement of two prisoners in a single cell on a restricted diet for 30 days did not violate the Eighth Amendment. 410 F. Supp. 251, 278 (ED Ark. 1976). While the Court today remarks that "the length of confinement cannot be ignored," *ante,* at 686, it does not find that confinement under the conditions described by the District Court becomes unconstitutional on the 31st day. It must seek other justifications for its affirmance of that portion of the District Court's order.

Certainly the provision is not remedial in the sense that it "restore[s] the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley,* 418 U. S. 717, 746 (1974) (*Milliken I*). The sole effect of the provision is to grant future offenders against prison discipline greater benefits than the Constitution requires; it does nothing to remedy the plight of past victims of conditions which may well have been unconstitutional. A prison is unlike a school system, in which students in the later grades may receive special instruction to compensate for discrimination to which they were subjected in the

from characterizing solitary confinement for a period in excess of 30 days as a cruel and unusual punishment; but given this position, a "remedial" order that no such solitary confinement may take place is necessarily of a prophylactic nature, and not essential to "bring an ongoing violation to an immediate halt."

earlier grades. *Milliken II, supra,* at 281–283. Nor has it been shown that petitioners' conduct had any collateral effect upon private actions for which the District Court may seek to compensate so as to eliminate the continuing effect of past unconstitutional conduct. See *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 28 (1971). Even where such remedial relief is justified, a district court may go no further than is necessary to eliminate the consequences of official unconstitutional conduct. *Dayton, supra,* at 419–420; *Pasadena Board of Education* v. *Spangler,* 427 U. S. 424, 435–437 (1976); *Swann, supra,* at 31–32.

The Court's only asserted justification for its affirmance of the decree, despite its dissimilarity to remedial decrees in other contexts, is that it is "a mechanical—and therefore an easily enforced—method of minimizing overcrowding." *Ante,* at 688 n. 11. This conclusion fails adequately to take into account the third consideration cited in *Milliken II:* "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." 433 U. S., at 281. The prohibition against extended punitive isolation, a practice which has not been shown to be inconsistent with the Constitution, can only be defended because of the difficulty of policing the District Court's explicit injunction against the overcrowding and inadequate diet which have been found to be violative of the Constitution. But even if such an expansion of remedial authority could be justified in a case where the defendants had been repeatedly contumacious, this is not such a case. The District Court's dissatisfaction with petitioners' performance under its earlier direction to "make a substantial start," *Holt* v. *Sarver,* 300 F. Supp. 825, 833 (ED Ark. 1969), on alleviating unconstitutional conditions cannot support an inference that petitioners are prepared to defy the specific orders now laid down by the District Court and not challenged by the petitioners. A proper respect for "the interests of state and local authorities in managing their own

affairs," *Milliken II*, 433 U. S., at 281, requires the opposite conclusion.[2]

The District Court's order enjoins a practice which has not been found inconsistent with the Constitution. The only ground for the injunction, therefore, is the prophylactic one of assuring that no unconstitutional conduct will occur in the future. In a unitary system of prison management there would be much to be said for such a rule, but neither this Court nor any other federal court is entrusted with such a management role under the Constitution.

## II

The Court advances separate theories to support the separate awards of attorney's fees in this case. First, the Court holds that the taxpayers of Arkansas may be held responsible for the bad faith of their officials in the litigation before the District Court. Second, it concludes that the award of fees in the Court of Appeals, where there was no bad faith, is authorized by the Civil Rights Attorney's Fees Awards Act of 1976. Pub. L. No. 94–559, 90 Stat. 2641, 42 U. S. C. § 1988 (1976 ed.). The first holding results in a totally unnecessary intrusion upon the State's conduct of its own affairs, and the second is not supportable under this Court's earlier decisions outlining congressional authority to abrogate the protections of the Eleventh Amendment.

## A

Petitioners do not contest the District Court's finding that they acted in bad faith. For this reason, the Court has no

---

[2] I reserve judgment on whether such a precautionary order would be justified where state officials have been shown to have violated previous remedial orders. I also note the similarity between this decree and the "no majority of any minority" requirement which was found impermissible in *Pasadena Board of Education* v. *Spangler*, 427 U. S. 424 (1976), even though it too might have been defended on the theory that it was an easily enforceable mechanism for preventing future acts of official discrimination.

occasion to address the nature of the showing necessary to support an award of attorney's fees for bad faith under *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240, 258–259 (1975). The only issue before us is whether a proper finding of bad faith on the part of state officials will support an award of attorney's fees directly against the state treasury under the ancillary-effect doctrine of *Edelman* v. *Jordan,* 415 U. S. 651, 668 (1974).

The ancillary-effect doctrine recognized in *Edelman* is a necessary concomitant of a federal court's authority to require state officials to conform their conduct to the dictates of the Constitution. "State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct." *Id.,* at 668. The Court today suggests that a federal court may impose a retroactive financial penalty upon a State when it fails to comply with prospective relief previously and validly ordered. "If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Ante,* at 691. This application of the ancillary-effect doctrine has never before been recognized by this Court, and there is no need to do so in this case, since it has not been shown that these petitioners have "refuse[d] to adhere to a court order." A State's jealous defense of its authority to operate its own correctional system cannot casually be equated with contempt of court.[3]

---

[3] In any event, it is apparent that the District Court did not consider its order a form of retroactive discipline supporting its previous orders. The court concluded that the allowance of the fee "may incline the Department to act in such a manner that further protracted litigation about the prisons will not be necessary." 410 F. Supp. 251, 285 (ED Ark. 1976). It does not appear to me that the court's desire to weaken petitioners' future resistance is a legitimate use of the *Alyeska* doctrine permitting the award of attorney's fees for past acts of bad faith.

Even were I to agree with the Court that petitioners had willfully defied federal decrees, I could not conclude that the award of fees against the taxpayers of Arkansas would be justified, since there is a less intrusive means of insuring respondents' right to relief. It is sufficient to order an award of fees against those defendants, acting in their official capacity, who are personally responsible for the recalcitrance which the District Court wishes to penalize. There is no reason for the federal courts to engage in speculation as to whether the imposition of a fine against the State is "less intrusive" than "sending high state officials to jail." *Ibid.* So long as the rights of the plaintiffs and the authority of the District Court are amply vindicated by an award of fees, it should be a matter of no concern to the court whether those fees are paid by state officials personally or by the State itself. The Arkansas Legislature has already made statutory provision for deciding when its officials shall be reimbursed by the State for judgments ordered by the federal courts. 1977 Ark. Gen. Act No. 543.

The Court presents no persuasive reason for its conclusion that the decision of who must pay such fees may not safely be left to the State involved. It insists, *ante,* at 699 n. 32, that it is "manifestly unfair" to leave the individual state officers to pay the award of counsel fees rather than permitting their collection directly from the state treasury. But petitioners do not contest the District Court's finding that they acted in bad faith, and thus the Court's insistence that it is "unfair" to impose attorney's fees on them individually rings somewhat hollow.[4] Even in a case where the equities were more strongly in favor of the individual state officials (as opposed to the State as an entity) than they are in this case,

---

[4] It is true that fees may be awarded under 42 U. S. C. § 1988 (1976 ed.) even in the absence of bad faith. But that statute leaves the decision to award fees to the discretion of the district court, which may be expected to alleviate any possible unfairness.

the possibility of individual liability in damages of a state official where the State itself could not be held liable is as old as *Ex parte Young*, 209 U. S. 123 (1908), and has been repeatedly reaffirmed by decisions of this Court. *Great Northern Life Insurance Co.* v. *Read*, 322 U. S. 47 (1944); *Ford Motor Co.* v. *Department of Treasury*, 323 U. S. 459 (1945); *Edelman* v. *Jordan, supra.* Since the Court evidences no disagreement with this line of cases, its assertion of "unfairness" is not only doubtful in fact but also irrelevant as a matter of law. Likewise, the Court's fear that imposition of liability would inhibit state officials in the fearless exercise of their duties may be remedied, if deemed desirable, by legislation in each of the various States similar to that which Arkansas has already enacted.

B

For the reasons stated in the dissenting portion of my Brother POWELL's opinion, which I join, I do not agree that the Civil Rights Attorney's Fees Awards Act of 1976 can be considered a valid congressional abrogation of the State's Eleventh Amendment immunity. I have in addition serious reservations about the lack of any analysis accompanying the Court's transposition of the holding of *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), to this case. In *Fitzpatrick*, we held that under § 5 of the Fourteenth Amendment Congress could explicitly allow for recovery against state agencies without violating the Eleventh Amendment. But in *Fitzpatrick, supra*, there was conceded to be a violation of the Equal Protection Clause which is contained *in haec verba* in the language of the Fourteenth Amendment itself. In this case the claimed constitutional violation is the infliction of cruel and unusual punishment, which is expressly prohibited by the Eighth but not by the Fourteenth Amendment. While the Court has held that the Fourteenth Amendment "incorporates" the prohibition against cruel and unusual punishment, it is not at all clear to me that it follows that Congress has the same enforcement power

under § 5 with respect to a constitutional provision which has merely been judicially "incorporated" into the Fourteenth Amendment that it has with respect to a provision which was placed in that Amendment by the drafters.

I would therefore reverse the judgment of the Court of Appeals in its entirety.