**Richard YOUNG, a/k/a Todd Devine; and Raymond Minnick, a/k/a Ray A. Minnick, Plaintiffs,**

v.

**P.W. KEOHANE, et al., Defendants.**

Civ. No. 88–1995.

United States District Court, M.D. Pennsylvania.

Nov. 13, 1992.

---

Richard Young, pro se.

Ray A. Minnick, pro se.

Kim Douglas Daniel, U.S. Attorney's Office, Harrisburg, PA, Robert J. DeSousa, U.S. Attorney's Office, Lewisburg, PA, for defendants.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

This is a *"Bivens"*—type civil rights action [1] in which the plaintiff, Richard Young, alleges federal prison officials violated his constitutional rights during his period of confinement as a pre-trial detainee at the United States Penitentiary in Lewisburg, Pennsylvania ("Lewisburg"). This matter comes before the court on cross-motions for summary judgment.[2] For the following reasons, summary judgment will be granted in favor of some defendants, but will be denied with respect to all other parties.

### I. Procedural History

Young filed the complaint on December 9, 1988 seeking injunctive and monetary relief for a wide assortment of constitutional violations alleged to have occurred dur-

ing his period of incarceration as a pretrial detainee at Lewisburg. The named defendants are the United States Bureau of Prisons, Bureau of Prisons Director J. Michael Quinlan, former United States Attorney General Edwin Meese, the United States Marshal for the Middle District of Pennsylvania, and numerous present and former Lewisburg employees and officials: Warden Patrick W. Keohane, W.C. Wells, William W. Thompson, G.W. Thomas, R. Conrath, B.B. McDermott, K. Spangler, Larry Womer, Richard Wagner, John J. Steppie and Leroy L. Blanks.[3]

Young's complaint challenges the constitutional adequacy of almost every aspect of his pretrial confinement at Lewisburg. He alleges he generally experienced greater deprivations of liberty than convicted inmates confined at the same institution. He also claims Lewisburg officials opened his legal and personal mail improperly, while affording him little or no opportunity to exercise, limited telephone privileges, no laundry service, no opportunity to have his hair cut, no reading material, no sanitary clothing and inadequate medical care.

More specifically, Young alleges that from June, 1988 through October, 1988, Lewisburg officials confined him in a room he refers to as a "fishtank", a converted gymnasium 31 feet long and 11 feet wide. Young was restricted to the fishtank 23 hours per day on Mondays through Fridays, and for 24 hours a day on Saturdays and Sundays. The fishtank housed up to 11 pretrial detainees at a time, all of whom were forced to sleep on folding cots that had no mattresses. At times, convicted

---

**1.** *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); 28 U.S.C. § 1331.

**2.** Previously, the court denied the defendants' motion to dismiss or for summary judgment insofar as it urged dismissal for failure to state a claim and informed the parties that the motion would be treated as one for summary judgment and disposed of in accordance with Fed. R.Civ.P. 56.

**3.** On November 29, 1989, the court consolidated this case with *Minnick v. Keohane,* Civil Action

No. 88–1906 (M.D.Pa, complaint filed November 22, 1988) (Rambo, J.), a case filed by Raymond Minnick, originally a co-plaintiff here. *See* Documents 75 and 76 of record. The allegations in No. 88–1906 were quite similar to those raised in this case, but the *Minnick* complaint named six additional defendants: Edwin Meese, the United States Marshal, and Lewisburg corrections officials Womer, Wagner, Steppie and Blanks. Minnick subsequently withdrew from this proceeding voluntarily, leaving Richard Young as the sole plaintiff. *See* Document 86 of record.

inmates allegedly boarded with detainees in the fishtank.

The fishtank itself had no toilet or sink, no tables or chairs, no drinking fountain and no television. Detainees confined in the fishtank were limited to drinks provided with their three daily meals, contained in cups "the size one would find in a dentist's office". While a toilet was located in an adjacent shower area separated from the fishtank by a steel gate, detainees had access to the toilet on a limited basis only because Lewisburg officials locked the gate from 8:00 a.m. to 3:00 p.m. on Mondays, Wednesdays and Fridays while convicted inmates showered. Detainees were sometimes left with no alternative but to urinate in cups inside the fishtank while the showers were being used. Moreover, because water drained from the shower area into the fishtank, the detainees were forced to remain on their cots while other inmates used the showers to avoid getting wet.

On October 26, 1988, Young and fellow detainee Raymond Minnick were moved to a cell six feet wide by 10 feet long, and confined there twenty-four hours per day for a period of time not specified in the complaint. The bunk bed provided was damaged "so that it had to be used upside down", and freedom of movement was severely constrained by the limited living space. Young claims that he was suffering with a diagnosed hernia during the period when he was double-celled with Minnick and that prison officials were aware of his condition yet did nothing about it.

After a period of discovery, the defendants filed a motion to dismiss or for summary judgment, alleging in support thereof that the case should be dismissed on the basis of qualified immunity, and, alternatively, because Young has not marshaled enough facts in support of his complaint to convince a reasonable jury that he is enti-tled to a verdict. The defendants also sought a stay of further discovery in order for the court to rule on the immunity issue. Young filed two motions for summary judgment, arguing in both that a judgment should be entered in his favor because the record establishes as a matter of law that he was subjected to unconstitutional overcrowding and other violations of his federally protected rights as a Lewisburg detainee.[4]

The court subsequently relieved the defendants from complying with Young's outstanding discovery requests pending disposition of their motion to dismiss or for summary judgment and denied their motion insofar as it sought a dismissal for failure to state a claim upon which relief can be granted. The court also informed the parties that the motion will be disposed of as a motion for summary judgment under Fed. R.Civ.P. 56, and ordered the parties to submit statements of undisputed material facts as required by M.D.Pa.Local Rule 401.4. The statements of material fact have been submitted and the motions for summary judgment are ripe for the court's consideration.

## II. Facts

The relevant undisputed material facts are as follows:

1. Young was confined at Lewisburg as a pretrial detainee awaiting trial on felony charges from June 1988 until February, 1989.

2. Young was first confined in the Administrative Detention section of the Special Housing Unit when he arrived at Lewisburg in June.

3. Young was housed in the institution hospital area during December 1988 and January 1989 for reasons unrelated to any need for health care.

4. Young was represented by and was permitted to contact a criminal de-

**4.** In a letter dated February 27, 1990, Document 89 of record, Young informed the court that he was assigned to the Medical Center for Federal Prisoners at Springfield, Missouri and therefore unable to "give attention to this legal action". He stated that he would inform the court upon his release, and requested a general extension of time in which to reply to any motions the government filed. Without issuing a formal order, the court honored Young's request. It was many months later, and only after the court denied the defendants' motion insofar as it sought a dismissal on the pleadings, that Young finally communicated with the court again.

fense attorney during the period of his pretrial detention at Lewisburg.

5. During the period of his pretrial detention, Young was permitted to place at least thirteen legal phone calls to confer with his attorney.

6. Young had at least two legal visits with his attorney during his pretrial detention period.[5]

7. Young was supplied with at least three postage stamps per week at no charge to him to send legal and personal correspondence.[6]

8. While in the Administrative Detention area of the Special Housing Unit, Young was housed with other pretrial detainees in a multipurpose room (the room he refers to as the fishtank) and had some access to toilet facilities and showers.

9. The Correctional Counselor is the prison staff member who operates as the primary liaison between pretrial detainees and other Lewisburg staff. The Correctional Counselor's duties include providing detainees and other inmates with legal phone calls, stamps, correspondence, and visits.

10. During Young's pretrial detention, he requested and received from defendant McDermott (a Correctional Counselor) Administrative Remedy forms, legal and social telephone calls, stamps, tobacco, forms to obtain visitor authorization, playing cards, legal pleadings forms, writing paper, envelopes, commissary cards and replacement commissary cards haircuts. McDermott attempted to ensure that legal and personal correspondence to and from Young was not inspected.

11. As a pretrial detainee, Young wrote several personal letters of appreciation to defendant McDermott, which stated in part: "I *LIKE YOU* Mr. McDermott ... You are the *only one* who helps us ... we will be sure that comes out in Court" and "I want you to know both Ray [Minnick] and I are aware *you* and *you alone* helped us through the hard times we were under ... In our lawsuit ... We'll be sure you are not affected in any way but POSITIVE." (Emphasis and capitalization in original).[7]

12. Young possessed full commissary privileges as a pretrial detainee. In 1988, he made purchases on July 5, 24, August 1, 4, 8, 16, 22, 27, September 2, 12, 19, October 3, 7, 17, 24, November 7, 8, 21, 22, December 1, 5, 6, 7, 9, 16, and 17, and on January 4, 10, 23, 30, February 7, 13, 17, 21, 23, and March 9 in 1989.

13. On September 19, 1988, Lewisburg staff received confidential information from the United States Marshals Service that Young was planning to escape from custody.

14. Thereafter, Lewisburg staff regularly inspected the contents of Young's outgoing personal mail to determine whether escape plans were discussed.

15. No inmate in Administrative Detention in the Special Housing Unit has access to television.

■ There is little else agreed upon in the record, and there is obvious disagreement about the facts that do not appear on the face of the parties' statements of material fact.[8] Indeed, the defendants' state-

---

**5.** The defendants claim Young had seventeen legal visits.

**6.** The defendants claim Young was issued over two hundred stamps during his pretrial detention period.

**7.** *See* Document 48 of record, defendants' exhibits 1 and 2.

**8.** M.D.Pa. Local Rule 401.4 provides that:

Upon any motion for summary judgment pursuant to Fed.R.Civ.P. 56, there shall be annexed to the motion a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set

ment was largely unrefuted by Young's statement. In evaluating the record for present purposes, however, the court considered all parties' statements of material fact, as well as factual conflicts and agreements manifested elsewhere in the record. Because Young is proceeding without the benefit of counsel, he is entitled to such deference when the sufficiency of his case is called into question. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972). He is also entitled to have all reasonable inferences about the facts resolved in his favor as the nonmoving party on the defendants' motion for summary judgment. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).[9]

### III. Qualified Immunity

■ Because qualified immunity is considered just as much an immunity from suit as it is from liability, questions of immunity should be resolved "at the earliest possible stage of the litigation". *Anderson v. Creighton,* 483 U.S. 635, 646, n. 6, 107 S.Ct. 3034, 3042, n. 6, 97 L.Ed.2d 523 (1987). A government official performing discretionary functions is entitled to qualified immunity "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brooks v. Andolina,* 826 F.2d 1266, 1268 (3d Cir.1987) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In some cases, the qualified immunity issue may also turn on "the complementary question whether defendant had a clearly established duty towards plaintiff." *Ryan v. Burlington County,* 860 F.2d 1199, 1205 (3d Cir.1988)

■ To determine whether the right allegedly violated was clearly established when the challenged conduct took place, the United States Court of Appeals for the Third Circuit has submitted the following guidelines:

> [T]he standard to which we look ... states that the contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This does not mean, however, that an official will be protected from suit unless the very action in question has previously been held unlawful; rather, the unlawfulness must be apparent in light of existing law.

*Id.* at 1208 (citations and quotations omitted). The official's state of mind is generally not a factor in determining whether immunity is available. *Harlow,* 457 U.S. at 815–17, 102 S.Ct. at 2736–38. Rather, the immunity question is resolved by examining the objective reasonableness of the defendant's conduct in light of clearly established federal law. *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); *Schrob v. Catterson,* 948 F.2d 1402, 1421 (3d Cir.1991); *Brown v. Grabowski,* 922 F.2d 1097, 1109 (3d Cir. 1991). Therefore, "arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." *Stoneking v. Bradford Area School District,* 882 F.2d 720, 726 (3d Cir.1989).

■ The constitutional standards regarding the conditions of a pretrial detainee's confinement were established in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Wolfish,* the Supreme Court ruled that a government can, in accordance with due process, incarcerate an individual charged with a criminal offense prior to an adjudication of guilt so long as the conditions of pretrial detention do not amount to punishment of the detainee. *Id.* at 535, 99 S.Ct. at 1871–72. Where punishment of a detainee is manifest, how-

---

forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the moving party.

**9.** The court notes that Young's verified complaint functions as the equivalent of an affidavit for summary judgment purposes. *Reese v. Sparks,* 760 F.2d 64, 67 (3d Cir.1985). *See Neal v. Kelly,* 963 F.2d 453 (D.C.Cir.1992); *Sheinkopf v. Stone,* 927 F.2d 1259 (1st Cir.1991); *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77 (5th Cir.1987).

ever, the detainee has been deprived of liberty without due process of law. *Id.*

■ In deference to valid considerations of prison administration, the *Wolfish* court acknowledged that "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense". *Id.* at 537, 99 S.Ct. at 1873. Accordingly, a district court evaluating the constitutionality of the conditions of a person's pretrial confinement "must decide whether [a] disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538, 99 S.Ct. at 1873. "[I]n the absence of a showing of intent to punish [10], a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Id.* at 539, n. 20, 99 S.Ct. at 1874, n. 20.

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539, 99 S.Ct. at 1874 (citation omitted).

■ Courts determining whether conditions and restrictions imposed on pretrial detainees are reasonably related to a legitimate government purpose

> must heed [the Supreme Court's] warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 540 n. 23, 99 S.Ct. at 1875 n. 23 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). *See Block v. Rutherford,* 468 U.S. 576, 584–85, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438 (1984). However, if limitations on a pretrial detainee's freedom are rationally related to a legitimate nonpunitive governmental purpose, they amount to punishment in any event if "they appear excessive in relation to that purpose." *Wolfish,* 441 U.S. at 561, 99 S.Ct. at 1886.

The rights of pretrial detainees announced by the Supreme Court in *Wolfish* in 1979 were recognized and applied in the Third Circuit long before Young's incarceration at Lewisburg. In *Union County Jail Inmates v. DiBuono,* 713 F.2d 984 (3d Cir.1983), the Third Circuit strictly adhered to the teachings of *Wolfish* when it described the following procedure for determining whether conditions imposed on a pre-trial detainee amount to punishment:

> "in determining ... whether conditions ... are such as to amount to punishment, which would violate the due process rights of pre-trial detainees, we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes. In assessing whether the conditions are reasonably related to the assigned purposes, we must, further, inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned for them."

*Id.* at 992 (quotations and citations omitted).

Perhaps it goes without saying, but Young's "clearly established" right to be free from punishment as a pretrial detainee is actually a very general and inexplicitly defined right. Indeed, a detainee's right to be free from punishment is no more self-explanatory than a convicted prisoner's right to be free from punishment that is cruel and unusual. The presence or ab-

---

**10.** Young has not suggested that the defendants affirmatively intended to punish him.

sence of punishment can be determined only by an extraordinarily fact-sensitive and contextual analysis, so the very conduct and conditions Young challenges in this lawsuit naturally have not been declared unconstitutional in previous case law. What is "clearly established" law for qualified immunity purposes, however, commands only some, "not precise factual correspondence between relevant precedents and the conduct at issue." *Ryan*, 860 F.2d at 1208. Accordingly, the defendants are charged with the responsibility of "consider[ing] the legal implications of their actions", *People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 145 (3d Cir.1984) and "relat[ing] established law to analogous factual settings." *Ryan*, 860 F.2d at 1208.

### A. Overcrowding and Other Conditions

■ The *Wolfish* court rejected the proposition of a "one man, one cell" principle protected by the Due Process Clause. *Wolfish*, 441 U.S. at 542, 99 S.Ct. at 1875. *See Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981) ("the Constitution does not mandate comfortable prisons, and prisons ... can not be free of discomfort"). Nonetheless, *Wolfish* recognized that subjecting a pretrial detainee to overcrowded conditions can, in some circumstances, violate the constitution. *Wolfish*, 441 U.S. at 542, 99 S.Ct. at 1875. Factors the Supreme Court considered in assessing whether the somewhat subjectively demarcated condition of "overcrowding" becomes a constitutional violation are the length of time an individual detainee must spend in a confined area both ultimately and on a daily basis, and the adequacy of the given sleeping space. *Id.* at 543, 99 S.Ct. at 1876. Beyond that, *Wolfish* is virtually silent on the issue of what incidents of overcrowding either alone or in the aggregate violate a pretrial detainee's right to be free from punishment before conviction. Accordingly, analyses of the overcrowding issue in the lower courts have, in large measure, involved comparisons of the *Wolfish* facts, which were held not to constitute punishment, to the unique characteristics of the prison conditions under consideration in a given case.

*Wolfish* involved a class action challenge to the constitutionality of conditions and practices at the Metropolitan Correctional Center ("MCC"), a federal detention facility located in New York City. The rooms housing pretrial detainees at the MCC had a total floor space of about 75 square feet. *Wolfish*, 441 U.S. at 541, 99 S.Ct. at 1875. Though the rooms were designed for one inmate, they generally housed two inmates and contained a double bunk bed, other items of furniture, a wash basin and a toilet. *Id.* Detainees at the MCC were required to spend up to eight hours each day in their rooms, but most of that time they presumably spent sleeping. *Id.* at 543, 99 S.Ct. at 1876. During the remainder of the day the detainees were permitted to move freely between their rooms and common areas in the facility. *Id.*

The Supreme Court conceded that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause", but found nothing "even approaching such hardship" in the record before it. *Id.* at 542, 99 S.Ct. at 1876. Factors critical to the court's conclusion were the spatial adequacy of the rooms for sleeping, the relative freedom with which the detainees moved about the facility during the day, and the fact that more than half of all MCC inmates spent less than ten days in the institution while almost all were released within 60 days. *Id.* at 543, 99 S.Ct. at 1876.

Despite its sharp tone of deference to prison administrators, the application of *Wolfish* has led to decisions in favor of detainees claiming unconstitutional overcrowding. In *Lareau v. Manson*, 651 F.2d 96 (2d Cir.1981), for example, the United States Court of Appeals for the Second Circuit stated that *Wolfish* establishes "a stringent test for determining when overcrowding will amount to punishment", and requires a detainee to demonstrate that "the overcrowding subjects [him or her] over an extended period to genuine privations and hardship not reasonably related

to a legitimate government objective." *Id.* The Second Circuit thus interpreted *Wolfish* in virtually the same manner as the Third Circuit did in *DiBuono.*

*Lareau* examined the constitutionality of conditions at a Connecticut correctional facility in which pretrial detainees were frequently double-bunked in cells designed for one inmate and not permitted to move freely from one area of the prison to another. Some detainees were confined in a converted all-purpose day room referred to as "the fishtank", which housed as many as nine men who, when the room was filled, had to crawl over one another to use the single toilet. The prison officials limited the pretrial inmates' opportunity for recreation to one and one half hours per day and not at all on weekends. Inmates, most of whom were incarcerated in the facility for more than sixty days, spent almost all of their time in crowded cells or equally crowded day rooms and "[t]hus, there [was] no real respite for the double-bunked inmate from the pressures of overcrowding." *Id.* at 101. The Second Circuit concluded that the conditions under attack were more egregious than those in *Wolfish,* and held that when a detainee "is subjected for a substantial length of time to the combination of double-bunked cells, overcrowded day rooms and strained prison services … he is being unconstitutionally punished." *Id.* at 105. The court determined further that use of the fishtank "constitute[s] punishment without regard to the number of days for which a prisoner is so confined." *Id.*

Overcrowded conditions experienced · by detainees were also found unconstitutional in *Lock v. Jenkins,* 641 F.2d 488 (7th Cir. 1981). In that case, detainees in an Indiana state prison were confined in cells containing a total of 37 square feet. Each cell contained a bed, a toilet and sink which in combination consumed 20 square feet of living space. The detainees were confined in their cells twenty-two hours per day, and ate their meals by sitting in bed and balancing food trays on their legs. Outdoor recreation was provided when weather permitted. The average period of detainment under those conditions, conditions described as more severe than conditions experienced by convicted felons at the same institution, was approximately sixty days. Reversing a district court determination that the detainees' living conditions passed constitutional muster, the United States Court of Appeals for the Seventh Circuit had "no hesitancy in concluding that confinement of [the] detainees in a prison maintained primarily for the purpose of punishment of convicted persons, under conditions more burdensome than those imposed on the general population of convicted felons, amounts to punishment under *Bell v. Wolfish.*" *Id.* at 494.[11]

The practice of housing detainees in conditions more severe than convicted inmates has been considered unconstitutional in the Third Circuit for quite some time. In *United States ex rel. Tyrell v. Speaker,* 535 F.2d 823 (3d Cir.1976), a pre-*Wolfish* case, the Third Circuit affirmed a district court's determination that state prison officials violated a pretrial detainee's right to due process under the Fourteenth Amendment by confining him under conditions that imposed materially greater restrictions on his freedom than those imposed upon convicted prisoners at the same institution. In that case, the plaintiff was a pretrial detainee housed in an administrative segregation unit, who, unlike convicted prisoners, could not send registered or certified mail, did not have commissary privileges, access to legal materials or an opportunity to use the prison law library. *Id.* at 826, n. 4. The plaintiff also had fewer opportunities to shower, exercise and visit the prison infirmary than general population inmates. The Third Circuit found that the plaintiff's conditions of confinement fell below constitutional standards because the prison official's decision to impose the restrictions was not based upon any articulated state interest. *Id.* at 826. The court noted that "the only legitimate state interest in the detention of an accused who cannot raise

---

11. Other cases decided since *Wolfish* that found unconstitutional overcrowding of pretrial detainees include *Campbell v. Cauthron,* 623 F.2d 503 (8th Cir.1980); *Ramos v. Lamm,* 485 F.Supp. 122 (D.Colo.1979); *See Lyons v. Powell,* 838 F.2d 28 (1st Cir.1988).

bail is in guaranteeing his presence at trial."

With the exception of defendants Bureau of Prisons, Quinlan, Meese and the United States Marshal, *see* Part D, granting the defendants qualified immunity on Young's claims related to overcrowding and other conditions in the fishtank would be inappropriate on the present record. In resolving this very difficult question in Young's favor, the court finds the defendants should have known that conduct similar to that which Young is capable of proving they committed had already been declared unconstitutional in cases employing well-reasoned *Wolfish* analyses like *Lareau* and *Lock*, as well as pre-*Wolfish* cases like *Tyrell.* It is worthy of comment that the difference between a ruling on the merits and resolving the issue of qualified immunity is dangerously narrow. Even the Third Circuit has lamented that "[t]he issues involved in considering the merits of qualified immunity claims are frequently difficult to separate from the issues involved in the merits of the liability question." *Ryan,* 860 F.2d at 1203, n. 7. *See Deary v. Three Un-named Police Officers,* 746 F.2d 185 (3d Cir.1984). With that in mind, the court must make it clear that it has not prejudged the strength of Young's case or predicted the eventual prevailing party or parties by ruling that certain defendants are not entitled to qualified immunity. Today's decision merely reflects the court's opinion that the record, construed in Young's favor, reveals that Young was exposed to conditions at Lewisburg that, *if proven at trial,* no reasonable prison official could have believed to be lawful under existing legal principles. The conclusions are based, as the Third Circuit requires, "on a qualitative and not a quantitative assessment of the resulting environment". *Union County Jail Inmates v. DiBuono,* 713 F.2d at 996.

The court finds that the following acts and omissions are, in combination, objectively unreasonable in light of both existing precedent and plain common sense, sometimes a rare commodity in a prison setting where overcrowding and lack of resources raise levels of frustration for staff and inmates alike. First is the conditions themselves, most of which either have no justifiable institutional objective or seem quite excessive in relation to the legitimate purposes (such as institutional security or the physical separation of detainees from the general population) that might be assigned for them. Construing the facts in the light most favorable to Young, the fishtank room in which he was confined from twenty-two to twenty-four hours per day had no wash basin, no toilet, no tables or chairs, no television and no drinking fountain. The fishtank housed up to eleven men at a time, with one folding sleeping cot per man. Though the fishtank is not as spatially restrictive as some cells described in other cases, any element of privacy or modesty is impossible to perceive under the circumstances Young describes. Moreover, the record could easily support a finding that range of movement within the unit was severely and unduly restrictive, especially at times of the day when detainees were forced to remain on their cots, none of which had mattresses, in order to avoid the running bath water which seeped into the fishtank from the adjacent shower area. Though there is some evidence that pretrial detainees had recreational opportunities, when the record is construed in Young's favor, those opportunities appear to have been short in duration and infrequently offered. Particularly distressing is Young's unrefuted allegations that limited access to an outside toilet regularly required detainees to urinate in cups inside the fishtank.

Young also spent almost six months in the fishtank, a period far in excess of the pretrial confinement described in any similar case, and a duration that strongly contributes to the unreasonable nature of the defendants' conduct. As the Supreme Court stated in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), "length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell ... might be tolerable for a few days and intolerably cruel for weeks or months." *Id.* at 686–87, 98 S.Ct. at 2571.

Especially troublesome is the fact that Young was confined under conditions more severe than those experienced by most convicted and sentenced prisoners at Lewisburg. Lewisburg is a maximum security federal penitentiary that houses persons convicted of serious crimes, many of whom have significant histories of violence both in and outside of prison. Conditions there are, by the very nature of the facility, punitive in character. While the defendants argue that Young's mail was censored because he was perceived as an escape risk, they have not made the same argument with respect to the conditions of his confinement. We presume the defendant prison officials were aware of Young's background as an escapee who was a fugitive for many years prior to his arrival at Lewisburg, and that they knew Young was sought by authorities as a suspect on a variety of criminal charges. But there is no suggestion that Young was detained in the fishtank for the legitimate purpose of alleviating the threat of escape. Because it appears from the record that all Lewisburg detainees were housed in the fishtank at the time in question, any proffered security objective for housing Young there other than to separate him from the general population would be without merit in any event. Finally, while one might argue persuasively that the foreboding character of the Lewisburg penitentiary and its inmates calls for uncompromising separation of convicts from detainees, the defendants have not established the existence of any security objectives that justify the imposition of far more restrictive conditions on pretrial detainees than convicted criminals.

The court acknowledges that certain conditions experienced by Young and the other detainees may have been beyond the control of some or all of the defendants. While that argument might be asserted as a defense to liability after further development of the record, it will not suffice as a justification for granting qualified immunity. *Pinto v. Nettleship,* 737 F.2d 130, 133 (1st Cir.1984).

## B. *Mail Inspections*

Recognizing a balance between the First Amendment rights of prisoners and the need for prison officials to maintain institutional security, the Supreme Court has stated that censorship of prisoner mail is justified if the regulation or practice in question furthers an important government interest unrelated to suppressing expression and the limitation on expression is no greater than necessary to further the government interest involved. *Procunier v. Martinez,* 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811–12, 40 L.Ed.2d 224 (1974). Of course,

> [t]his does not mean ... that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. *But any regulation or practice that restricts inmate correspondence must be generally necessary to protect ... legitimate governmental interests.*

*Id.* (emphasis added). In order to satisfy the standards articulated in *Martinez,* regulations or practices concerning mail censorship must further a substantial government interest in prison security, institutional order or rehabilitation. *Id.* at 413, 94 S.Ct. at 1811; *Todaro v. Bowman,* 872 F.2d 43, 49 (3d Cir.1989); *Brooks v. Andolina,* 826 F.2d at 1268.

While there are few reported cases on the subject nationwide, judges in this district have found censorship of a prisoner's mail constitutionally objectionable. In *Carty v. Fenton,* 440 F.Supp. 1161 (M.D.Pa.1977), for example, Judge Muir found that federal prison officials violated an inmate's right of free access to the courts when they opened incoming mail from Alabama state courts, several United States district courts and the United States Department of Justice outside the presence of the plaintiff. In a similar case, then Chief Judge Nealon determined that a federal inmate stated a viable cause of action

for mandamus relief when the inmate complained that his jailers opened mail from state and federal courts outside his presence. *Thornley v. Edwards,* 671 F.Supp. 339 (M.D.Pa.1987).

In addition to the judge-made, constitutionally-based restrictions, federal regulations also circumscribe the ability of prison officials to either censor or open correspondence between inmates and attorneys or government officials. 28 C.F.R. §§ 540.-18 [12], 540.19 [13] (1985). Where the inmate is a pretrial detainee, even general correspondence is to be "sent out unopened and uninspected." 28 C.F.R. § 540.14(a) (1985).

■ Young claims that Lewisburg officials opened his outgoing legal and general correspondence. As a detainee, it would appear—at least from federal regulations—that none of his outgoing mail was subject to inspection, and therefore, the defendants could not have reasonably believed that opening Young's mail did not encroach upon his federally protected rights absent overriding security concerns. The defendants' asserted justification for opening Young's outgoing mail was that they believed he was plotting an escape. Their argument fails for two reasons. First, evidence supplied by the defendants

suggests that Young's outgoing mail had been opened before they were informed of the alleged escape plans. Secondly, while it may have been proper to censor outgoing personal mail in order to thwart an escape, it seems quite unreasonable to intercept mail addressed to judges and court personnel as a means of maintaining institutional security. Accordingly, the defendants (again, with the exception of the Bureau of Prisons, Quinlan, Meese and the United States Marshal, *see* Part D) are not entitled to qualified immunity from Young's mail inspection claims.

### C. Medical Care

■ The standards regarding medical care for pretrial detainees are at least as great as those that protect convicted prisoners. *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326, 346 n. 31 (3d Cir.1987); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979). Accordingly, a detainee is punished in violation due process when prison officials are deliberately indifferent to the detainee's serious medical needs. *West v. Keve,* 571 F.2d 158, 161 (3d Cir.1979).

12. 28 C.F.R. § 540.18 refers to special mail. The regulation provides that:
 (a) The Warden shall open incoming special mail only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail. The correspondence may not be read or copied if the sender is adequately identified on the envelope, and the front of the envelope is marked "Special Mail—Open only in the presence of the inmate".
 (b) In the absence of either adequate identification or the "special mail" marking indicated in paragraph (a) of this section appearing on the envelope, staff may treat the mail as general correspondence and may open, inspect, and read the mail.
 (c) Outgoing special mail may be sealed by the inmate and is not subject to inspection.
 (d) Staff shall stamp the following statement directly on the back side of the inmate's outgoing special mail: "The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has been neither opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or

clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address."

13. 28 C.F.R. § 540.19 relates to legal correspondence. In relevant part, the regulation provides that:
 (a) Staff shall mark each envelope of incoming legal mail (mail from courts or attorneys) to show the date and time of receipt, the date and time the letter is delivered to an inmate and opened in the inmate's presence, and the name of the staff member who delivered the letter. The inmate may be asked to sign as receiving the incoming legal mail. This paragraph applies only if the sender has marked the envelope as specified in § 540.18.
 (b) The inmate is responsible for advising any attorney that correspondence will be handled as special mail only if the envelope is marked with the attorney's name and an indication that the person is an attorney, and the front of the envelope is marked "Special Mail—Open only in the presence of the inmate". Legal mail shall be opened in accordance with special mail procedures (see § 540.18).

■ Young's only allegations regarding medical care are that he was suffering from a hernia and the defendants refused to provide him with a hospital bed. Neither he nor the defendants have developed the record with regard to this claim. Nonetheless, as the allegations stand, they are too unspecific to permit Young to proceed with this claim, let alone rule on the defendants' qualified immunity defense. Simply put, refusing to provide a hospital bed for an inmate with a hernia, without more, does not necessarily violate the Constitution. Accordingly, the court rescinds that portion of its August 2, 1991 order denying the defendants' motion to dismiss Young's complaint insofar as that order applies to Young's allegations regarding medical care. *See* Document 91 of record. The claims regarding medical care will be dismissed without prejudice to the plaintiff's right to reassert them in an amended complaint within thirty (30) days.

■ If he chooses to file an amended complaint, Mr. Young is reminded to state with particularity the conduct alleged to have caused the constitutional deprivation, as well as the time, the place and the persons responsible. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir.1988), citing *Hall v. Pennsylvania State Police*, 570 F.2d 86, 89 (3d Cir.1978). This requirement is designed to give the defendants sufficient notice of the claims asserted against them so that they can prepare responsive pleadings adequately. *Frazier v. Southeastern Pennsylvania Transportation Authority*, 785 F.2d 65, 67 (3d Cir. 1986). It also permits the court to weed out frivolous claims and those that should be heard in other fora. *Rotolo v. Borough of Charleroi*, 532 F.2d 920 (3d Cir.1976); *Valley v. Maule*, 297 F.Supp. 958 (D.Conn. 1968).

The plaintiff is advised that any amended complaint must be complete in all respects. It must be a new pleading which stands by itself as an adequate complaint without reference to the complaint already filed. It may not contain conclusory allegations. Rather, it must establish the existence of specific actions by the defendants which have resulted in constitutional deprivations. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The amended complaint must also be "simple, concise, and direct" as required by the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 8(e)(1).

### D. *Bureau of Prisons, Quinlan, Meese and the United States Marshal*

■ It is difficult to determine what Young attempted to accomplish by naming these parties as defendants because there are no allegations of improper conduct directed at any of them. It is also clear from controlling Third Circuit precedent that none of these defendants owe an affirmative, enforceable duty to the plaintiff. *Chinchello v. Fenton*, 805 F.2d 126 (3d Cir.1986). Therefore, the motion for summary judgment on the basis of qualified immunity will be granted in favor of the Bureau of Prisons, Quinlan, Meese and the United States Marshal.

### IV. Summary Judgment

The standards governing motions for summary judgment are well-known in the legal profession. They bear repeating in this case, however, because Young is a *pro se* litigant, apparently capable, yet unschooled in law.

Federal Rule of Civil Procedure 56(c) requires that the court render summary judgment "... forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original).

In determining whether there is a genuine issue of material fact[14], the court must view all facts and all reasonable inferences in favor of the nonmoving party. *Clement v. Consolidated Rail Corporation*, 963 F.2d 599, 600 (3d Cir.1992). In order to stave off a summary judgment motion, however, the nonmoving party may not rest on the bare allegations of his or her pleadings. Once the moving party has satisfied its burden under Rule 56(c) of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e)[15] to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir.1992). If, however, "the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Advisory Committee Notes to Fed.R.Civ.P. 56(e) (1963 Amend.).

Viewing the undisputed facts in the light most favorable to Young, the court finds that (not withstanding their entitlement to qualified immunity) the Bureau of Prisons, Quinlan, Meese and the United States Marshal are also entitled to summary judgment on the merits. The record does not support a similar grant on behalf of Young or the remaining defendants.

### Bureau of Prisons

In order to prevail on a civil rights claim, the plaintiff must prove two things: (1) that some person has deprived him of a federally protected right, and (2) that the person who deprived him of that right acted under the color of law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988). Governmental agencies like the Bureau of Prisons, however, are not subject to civil rights damages for the simple reason that they are not persons within the meaning of civil rights jurisprudence. *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989). While a government agency may be held liable for the constitutional torts of its officials in a limited class of cases, none of the circumstances required to impose such liability are present here. *See City of Canton v. Harris* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989); *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

### Meese, Quinlan and the United States Marshal

A defendant in a civil rights action must personally participate in the

---

**14.** A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under the substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287–88 (3d Cir.1991).

**15.** In relevant part, Rule 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

alleged wrongs in order to incur liability, *Rode v. Dellarciprete,* 845 F.2d at 1207, i.e., civil rights liability can not be predicated on *respondeat superior. Roman v. Jeffes,* 904 F.2d 192, 196 (3d Cir.1990); *Stoneking v. Bradford Area School District,* 882 F.2d at 724; *Capone v. Marinelli,* 868 F.2d 102, 106 (3d Cir.1989).[16]

Neither Meese, Quinlan nor the Marshal has specifically argued lack of personal participation in support of their motion, but because Young filed motions for summary judgment on all issues and thereby availed himself of the opportunity to demonstrate the sufficiency of his entire case, he has opened the door for the court to enter judgment in favor of the defendants on any grounds apparent in the record. As one commentator has noted,

> [t]he practice of allowing summary judgment to be entered for the nonmoving party in the absence of a formal cross-motion is appropriate. It is in keeping with the objective of Rule 56 to expedite the disposition of cases and, somewhat more remotely, with the mandate of Rule 54(c) requiring the court to grant relief to which a party is entitled even if the party has not demanded such relief in his pleadings.

Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720 (West 1983) (quotations omitted).

Young has not levied a single allegation against either Quinlan or Meese that even remotely connects them with the deprivations he suffered at the Lewisburg penitentiary. Indeed, it would be difficult to imagine that the Director of the Bureau of Prisons and the Attorney General of the United States, both of whom are national leaders of agencies employing many thousands of people, could have played a personal role in the day-to-day operation of a pretrial detention program at a single corrections facility. Because nothing in the record implicates these individuals either directly or inferentially in any improper conduct, judgment must be entered in their favor.

■ With regard to the Marshal, the record indicates that his conduct was limited to forwarding information to Lewisburg officials that the plaintiff was involved in a possible escape attempt. The record reveals that in September, 1988, the Marshal's office informed Lewisburg staff that it had received confidential information that Young might attempt an escape while on a community trip, by attempting to be released to the custody of persons impersonating law enforcement officials or through a falsely induced medical emergency trip. While Lewisburg officials admit that the information furnished by the Marshal ultimately led to the censorship of Young's mail, the Marshal's tangential involvement in the prison officials' conduct was only an indirect cause of the censorship. Not every injury in which a government official has played some role can be vindicated in a civil rights action. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). Thus, even if the court assumes Young were deprived of a federal right when prison officials censored his mail, he may not recover against the Marshal because the deprivation was merely an indirect or incidental result of the Marshal's conduct. *Cospito v. Heckler,* 742 F.2d 72, 82 (3d

---

**16.** Both *Rode* and *Capone,* like other cases referred to in this opinion, were brought under 42 U.S.C. § 1983, not directly under the constitution pursuant to *Bivens.* Though neither the Supreme Court nor the Third Circuit has ruled specifically on the applicability of *respondeat superior* to *Bivens* suits, most courts considering the issue have borrowed § 1983 principles and not applied the doctrine. *See Dean v. Gladney,* 621 F.2d 1331, 1334 (5th Cir.1980) (citing cases). It is unlikely that the Third Circuit would allow *Bivens* plaintiffs to use theories of recovery unavailable in § 1983 litigation. *See Schrob v. Catterson,* 948 F.2d at 1408 (3d Cir.1991) ("courts have generally relied upon the principles developed in the case law applying Section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials"); *Paton v. LaPrade,* 524 F.2d 862, 871 (3d Cir.1975) ("Because a *Bivens*-type cause of action is the federal counterpart to claims under 42 U.S.C. § 1983, we believe that standards for determining injuries developed in § 1983 litigation are applicable in this context."). Until this court is directed otherwise by a higher court, therefore, § 1983 principles will be applied with full force in *Bivens* cases.

Cir.1984). Issues of causation aside, nowhere in the record is there evidence that the Marshal acted improperly when he relayed information about Young's alleged escape plans. Under the circumstances, the Marshal is also entitled to summary judgment because Young can not prove that he participated in unconstitutional conduct.

### The Remaining Defendants

 Clearly, defendant Keohane may not be held liable for violating Young's constitutional rights on the basis of his status as the Lewisburg warden alone. Even if the other defendants are ultimately found culpable, the warden's mere failure to act in the face of an unconstitutional act committed by one or more of his subordinates can not be a basis for the imposition of civil rights liability. *Rizzo v. Goode*, 423 U.S. at 376, 96 S.Ct. at 606 (1976). However, a supervisory official "may not with impunity maintain a custom, practice or usage that communicate[s] condonation or authorization of [unconstitutional behavior]," *Stoneking*, 882 F.2d at 730, and the record does not totally discredit the possibility that Keohane either acted with deliberate indifference to the conditions Young experienced as a Lewisburg detainee, or knew about those conditions and yet did nothing.

There is evidence which suggests that some defendants, McDermott for example, conducted themselves within constitutional limits in their interpersonal contacts with Richard Young. An individual like McDermott may not be relieved from the burden of litigation at this point, however, merely because he may have supplied Young with stamps or paper or tobacco on a given day, or saw to it that Young received a visit to the law library. This case is just as much about what *wasn't* done to or for Richard Young as what *was* done to him. Accordingly, a defendant may not escape liability by proving only that he did this or didn't do that. Because there remain genuine issues of material fact regarding each defendant's role, if any, in the malfeasance and nonfeasance depicted by Young, it is incumbent upon the defendants to be more specific about their duties within the prison and their precise obligations toward Young as the case develops. Until that time, releasing any of the remaining defendants from this suit is totally unwarranted.

### V. Conclusion

The plaintiff's motions for summary judgment will be denied. The defendants' motion for summary judgment will be granted in part and denied in part. Summary judgment will be entered in favor of the Bureau of Prisons, Quinlan, Meese and the United States Marshal both on the basis of qualified immunity and on the merits.

The court's order dated August 2, 1991, Document 91 of record, will be rescinded inasmuch as it denied the defendants' motion to dismiss Young's claims regarding adequate medical care. The motion to dismiss the medical claims will be granted without prejudice to Young's right to renew the claims in an amended complaint which adheres to the standards set forth above within thirty (30) days.

Counsel for the defendants and Mr. Young will be directed to appear in chambers for a case management conference on December 15, 1992. They should be prepared to meet with the court to conduct a detailed, extensive discussion during which all remaining aspects of this case will be discussed. The parties are reminded that Fed.R.Civ.P. 16 allows the court to simplify the issues, avoid unnecessary proof and cumulative evidence, identify witnesses and eliminate frivolous claims or defenses. *See Stackhouse v. Marks*, 556 F.Supp. 270 (M.D.Pa.1982).

An appropriate order is attached.

### ORDER

NOW, THIS 13th DAY OF NOVEMBER, 1992, IT IS HEREBY ORDERED THAT:

1. The plaintiff's motions for summary judgment are denied.

2. The defendants' motion for summary judgment is granted in part and denied in part.

3. Summary judgment is granted in favor of defendants Bureau of Prisons,

Quinlan, Meese and the United States Marshal on the basis of qualified immunity and on the merits.

4. The defendants' motion for summary judgment is denied with respect to all other defendants.

5. The court's order dated August 2, 1991, Document 91 of record, is rescinded to the extent that it denied the defendants' motion to dismiss the plaintiff's claims regarding adequate medical care.

6. The defendants' motion to dismiss the plaintiff's claims regarding adequate medical care is granted without prejudice to the plaintiff's right to file an amended complaint regarding those claims within thirty (30) days of the date of this order.

7. Counsel for the defendants and the plaintiff are directed to appear in Chambers for a pretrial/case management conference at 10:00 a.m. on December 15, 1992.

8. As the court is advised that the plaintiff's current address is "Lackawanna County Prison, 1371 North Washington Avenue, Scranton, PA 18509", the Clerk of Court is directed to mail him a copy of this Memorandum and Order at that address and amend the records in this case to reflect Young's present place of incarceration.

9. The Warden at the Lackawanna County Prison is directed to produce the person of Richard Young in the United States District Court for the Middle District of Pennsylvania in Scranton, Pennsylvania, at 10:00 a.m., December 15, 1992, in Chambers for a pretrial/case management conference in this action; to keep the prisoner safe in custody and confine him at all times in a suitable place of confinement when he is not appearing before the court; and at the conclusion of the conference, to return the prisoner to his place of confinement prior to the conference to serve the balance of his sentence or sentences heretofore imposed upon him.